**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **THE DIAMOND CONSORTIUM, INC.** | § | |
| **D/B/A THE DIAMOND DOCTOR** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **Civil Action No. 4:16-CV-94** |
| vs. | § | |
| | § | |
| **BRIAN MANOOKIAN, CUMMINGS** | § | |
| **MANOOKIAN, PLC, MARK** | § | |
| **HAMMERVOLD, and** | § | |
| **HAMMERVOLD, PLC,** | § | |
| | § | |

## THE DIAMOND DOCTOR'S SECOND AMENDED COMPLAINT

Plaintiff The Diamond Consortium, Inc. d/b/a The Diamond Doctor files this Second Amended Complaint (which by agreement with defense counsel has been consolidated with 4:16-cv-00382 in the Northern District of Texas, which is still an active pleading as if set forth fully herein, which by agreement will subsequently be put into a unified, consolidated complaint) complaining of Defendants Brian Manookian, Cummings Manookian, PLC, Mark Hammervold, and Hammervold, PLC, and respectfully shows the Court the following:

### I.      PARTIES

1.      Diamond Consortium, Inc. d/b/a The Diamond Doctor ("The Diamond Doctor") is a Texas corporation with its principal place of business located at 8127 Preston Road, Dallas, Texas 75225.

2.      Brian Manookian is a natural person and resident of the state of Tennessee. His address is 133 Trail East Drive, Hendersonville, Tennessee, or alternatively, 112 West End Close, Nashville, Tennessee.

3.     Cummings Manookian, PLC is a Tennessee professional limited liability company in the business of the practice of law and has its principal place of business in Davidson, County, Tennessee. Cummings Manookian, PLC can be served through its registered agent in the State of Tennessee, Cummings Manookian, PLC at 1901 Wildwood Avenue, Nashville, Tennessee 37212-5716 or through one of its Members, Brian Cummings or Brian Manookian at 102 Woodmont Blvd., #241, Nashville, Tennessee 37205.

4.     Mark Hammervold is a natural person and resident of the State of Illinois. His address is 1758 North Artesian Avenue, Chicago, Illinois 60647.

5.     Hammervold PLC is a Tennessee professional limited liability company in the business of the practice of law and has its principal place of business in Davidson, County, Tennessee.  Hammervold, PLC can be served through its registered agent in the State of Tennessee, InCorp Services, Inc. at 216 Centerview Drive, Suite 317, Brentwood, Tennessee 37027-3226, or through one of its Members, Mark Hammervold at 1758 North Artesian Avenue, Chicago, Illinois 60647.

## II.     JURISDICTION AND VENUE

6.     The Court has jurisdiction over non-residents Brian Manookian and Mark Hammervold because Brian Manookian and Mark Hammervold purposefully availed themselves of the privileges and benefits of conducting business in Texas by committing torts and other illegal acts, which are the subject matter of this suit, in whole or in part in Texas. The Court has jurisdiction over non-resident Cummings Manookian, PLC because Cummings Manookian, PLC, by and through its agent Brian Manookian, purposefully availed itself of the privileges and benefits of conducting business in Texas by committing torts and other illegal acts, which are the subject matter of this suit, in whole or in part in Texas.

7.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1694(a). The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1332 because the parties are completely diverse and the amount controversy exceeds $75,000.

8.     Venue is proper in this Court as it is in this District that at least part of the acts, omissions, and injuries giving rise to The Diamond Doctor's claims occurred. Venue is further proper pursuant to 18 U.S.C. § 1965.

### III. EXECUTIVE SUMMARY OF THE LAWSUIT

9.     This is a case about David Blank ("Blank"), a long-time, well-respected Dallas area businessman, and The Diamond Doctor, the business he owns and built from scratch. The Diamond Doctor is a retailer and wholesaler of diamonds and other jewelry. The Diamond Doctor enjoys a reputation for honest business practices through the sale of high quality jewelry at fair, competitive prices. Unfortunately, in the fall of 2015, The Diamond Doctor fell victim to an attempted fraudulent shakedown scheme perpetrated by at least one unscrupulous attorney out of Tennessee, Brian Manookian ("Manookian").

10.    Manookian is the central figure in a nationwide, sophisticated, multi-pronged shakedown operation. Manookian and his law firm Cummings Manookian, PLC ("Cummings Manookian") have selectively targeted and systematically attacked prominent, successful retail jewelers in Washington, DC, Philadelphia, Pennsylvania, Atlanta, Georgia, San Francisco, California, and St. Petersburg, Florida, as well as The Diamond Doctor. As in this case, Manookian's shake down scheme is achieved with internet, social media, and door hanger smear campaigns. The campaigns all attack reputable businessmen as criminals and "fraudsters."

11.    Manookian's purpose is to harass and intimidate the jewelers themselves into believing their businesses are in jeopardy by way of mass amounts of (largely imaginary) diamond

"over-grading" claims, which Manookian is quick to threaten but never seems to get around to filing. The jewelers, in turn, are encouraged through a third party, former Manookian target, and now client of the Cummings Manookian law firm to beg for peace by way of "engaging" Cummings Manookian and paying millions of dollars in what amounts to protection money to end the harassment.

12.     Mark Hammervold and Hammervold, PLC round out this conspiracy and extortion scheme. Once Manookian solicits clients to sue jewelers, he refers those cases to Hammervold of Hammervold, PLC, so Manookian will have no apparent conflict when he later enters into an agreement to represent the targeted jewelers.

13.     It is this scheme that came calling The Diamond Doctor in the fall of 2015. Without any warning or notification, beginning in or around October 2015, Manookian established two websites, diamonddoctorlawsuit.com and diamonddoctorclassaction.com, accusing The Diamond Doctor of having committed "diamond fraud" and "cheat[ing]" customers through the sale of "overgraded" diamonds. The websites contained pictures of The Diamond Doctor's physical location and trademarks. Another website diamonddoctorfraud.com accuses The Diamond Doctor and Blank of "crimes."

14.     Manookian then started placing messages in The Diamond Doctor's Facebook newsfeed "Is Diamond Doctor a scam?" Manookian's Facebook posts targeted The Diamond Doctor's employees "Do you work here? Ask David Blank if you be personally liable for the fraudulent sale [of diamonds]?" Manookian followed that with YouTube videos with the titles "Diamond Doctor Scam: 3 Reasons Why Diamond Doctor Are Frauds," "Diamond Doctor Lawsuit: Take Action from Diamond Doctor's Fraud," "Diamond Doctor: David Blank Diamond

Fraud," "The Diamond Doctor Lawsuit: The Ultimate Scam," "Diamond Doctor Found Guilty," and others.

15.     Manookian even distributed fliers and door hangers around The Diamond Doctor's location and Blank's residential neighborhood. "Diamond Doctor has been ripping off unsuspecting customers with . . . overgraded diamonds."

16.     In fact, Manookian's campaign was and is completely false. The Diamond Doctor's business is not a "scam." The Diamond Doctor and Blank do not commit "fraud" or sell "overgraded diamonds." They are not "guilty" of any "crimes." Manookian has not brought a single lawsuit—much less a class action—against The Diamond Doctor.

17.     The Diamond Doctor initially responded with a written demand to Manookian, requesting that he halt his campaign of harassment. When that did not work, The Diamond Doctor– through previous counsel –filed suit in Texas state court seeking to enjoin Manookian's actions. The state court denied the request for injunction, and unsurprisingly, Manookian's campaign continued.

18.     At the same time, Blank learned about other jewelers around the country also suffering from Manookian's harassment. From his discussions with his friends and colleagues around the country, Blank came to understand that several of Manookian's victims had escaped the onslaught of harassing propaganda by "hiring" Cummings Manookian as the victim's lawyers. The convoluted logic of the arrangement was explained to Blank as the victim gains freedom from Manookian's campaign because Cummings Manookian is conflicted out of representing any prospective plaintiffs that may be found. Manookian solicits prospective clients to sue these jewelers and then refers any business to Mark Hammervold, who conspires with Manookian to prosecute the cases so Manookian will not be conflicted out of entering into "engagement

agreements" with the targeted jewelers as part of his extortion scheme. In exchange for this "legal counsel," the victim is required to pay Cummings Manookian an exorbitant sum of money that is paid out as a monthly retainer to the firm for several years. Additionally, should the victim decide it no longer wishes to employ Cummings Manookian's services, the payoff amount and monthly retainers continue to be due by the victim no matter what.

19.     Fearing he had no alternative to stop Manookian's potentially business-crippling propaganda campaign, Blank decided to try to pay his extortionist. He contacted Manookian directly and asked if The Diamond Doctor could engage Cummings Manookian to act as its legal counsel. Knowing that The Diamond Doctor had already filed and nonsuited a lawsuit against him, Manookian chose to play coy and decline representation initially. Not until he had driven the payoff price up to a sufficient level for his interest did Manookian finally agree that Cummings Manookian could, in fact, act as The Diamond Doctor's Counsel.

20.     The total amount to pay was discussed back and forth and a final "Consulting/Engagement Agreement" was ultimately sent by Manookian to Blank for his execution. However, before signing the fateful "Consulting/Engagement Agreement" with Cummings Manookian, Blank decided that he could not allow The Diamond Doctor to be victimized in this fashion.

21.     Rather than give into the demands of an extortionist, The Diamond Doctor has decided to expose Manookian and his thinly veiled, albeit sophisticated scheme of extortion and shakedowns. The Diamond Doctor brings claims for violations of RICO and other causes of action against Manookian.

# IV. FACTUAL BACKGROUND

## A. The People and Entities Involved.

19. <u>The Diamond Doctor</u>. The Diamond Doctor is a Dallas-based wholesaler and retailer of diamonds, gemstones, and other jewelry. The Diamond Doctor attracts customers from Dallas and the surrounding suburbs including Plano, Texas. The Diamond Doctor has earned and enjoys a reputation in the community for selling high-quality jewelry at fair prices. The Diamond Doctor is a contributor to MD Anderson Cancer Center, St. Jude's Children's Hospital, the Suicide Crisis Prevention Center, American Heart Association, the Jewish Federation, and many other charities benefitting the underprivileged and other causes.

20. <u>David Blank.</u> David Blank owns The Diamond Doctor. In his native South Africa, Blank built a successful jewelry business before immigrating to the United States and becoming a proud, naturalized citizen. In the U.S., Blank started over in the jewelry business and worked as an entry-level salesman for a diamond wholesaler. He was eventually able to start another business and founded The Diamond Doctor.

20. <u>Manookian</u>. Defendant Manookian is a Nashville, Tennessee, based lawyer and the main perpetrator of the illegal scheme to extort The Diamond Doctor.

21. <u>Cummings Manookian</u>. Cummings Manookian, PLC is a two-person law firm in Nashville, Tennessee. Upon information and belief, Manookian and Brian Cummings are partners in Cummings Manookian. Cummings Manookian is the instrument through which Manookian perpetrates his scheme.

22. <u>Brian Cummings</u>. Cummings participated in the targeting of at least one victim in the nationwide extortion scheme Manookian operates.

23. <u>Boaz Ramon</u>. Ramon is the owner of Genesis Diamonds. On or around January 17, 2012, Manookian filed suit *pro se* against Genesis Diamonds and Ramon individually for allegedly selling him an over-graded diamond. (*See* First Amended Complaint App. 37 – App. 46.) Then, on or around July 22, 2015, Manookian filed suit against Genesis Diamonds and Ramon for the same claims. (App. 47 – App. 60.) On or around August 18, 2012, Cummings brought suit while with the Nashville law firm of Levine, Orr & Geracioti against Genesis Diamonds alleging it sold over-graded diamond cufflinks. (App. 61 – App. 76.) Now, Genesis Diamonds is actually a client of Cummings Manookian in other litigation. (App. 77 - App. 94.)

24. Ramon has participated in Manookian's attempts to extort retail jewelers in Washington, DC, Philadelphia, South Florida, and Atlanta by encouraging the victims to negotiate with Manookian in order to avoid the harassment campaigns. Ramon warns the victims before Manookian's harassment campaigns commence and advises them to contact Manookian directly in order to avoid being targeted.

25. <u>Mark Hammervold and Hammervold, PLC</u>. Hammervold is a lawyer and solo practitioner in Nashville with the law firm of Hammervold, PLC and former colleague of Manookian's when they worked together at the Gideon Cooper & Essary law firm. Manookian solicits clients to sue the targeted jewelers and then refers the cases to Hammervold and his law firm to prosecute so Manookian thereby avoids an appearance of a conflict when he enters into "engagement agreements" with the targeted jewelers. Hammervold of Hammervold, PLC is the lead attorney in two pending consumer suits against a Manookian victim in Washington, D.C., and has sent The Diamond Doctor four notice letters pursuant to the Texas Deceptive Trade Practices Act. Hammervold and his law firm are currently representing Manookian in pending litigation in Tennessee state court over ownership interests in a gun armory operated by Manookian and other

individuals. (App. 95 – App. 136.) Hammervold has also acted as co-counsel with Manookian in at least two federal lawsuits filed in the Middle District of Tennessee.

**B. How Retail Diamonds Are Graded.**

26.     Manookian uses allegations about the different grading systems used in the retail diamond industry to ensnare victims in his extortion scheme. Thus, a cursory understanding of the different methods of diamond grading is helpful.

27.     <u>There Is No Agreed Upon Industry Standard</u>. It is critical to understand that there is no universally agreed-upon—much less legally binding or mandated—grading standard for diamonds. Diamond traders and jewelers ***may*** perceive specific grading entities as being more stringent, exacting, or consistent than others. Accordingly, diamonds possessing such a certification from a laboratory considered more stringent or exacting ***may*** command a higher retail price or appraised value than a diamond from a laboratory viewed as less stringent or exacting. There are over a dozen laboratories which grade diamonds, including the Gemological Institute of America ("GIA"), EGL Platinum ("EGL"), the American Gem Society, and the International Gemological Institute. Evaluations from the same laboratory of the same diamond could vary as could evaluations from different laboratories.

28.     <u>GIA</u>. The GIA is perhaps best known for developing a widely used grading system for diamonds which employs what is commonly known as the "4Cs": cut, color, clarity, and carat weight. From those characteristics, a report with an overall "grade" of the diamond is generated. Some in the jewelry industry perceive a certification from the GIA as a relatively more credible evaluation of a diamond's overall quality and, thus, capable of playing a larger role in its monetary value. Regardless of GIA's perceived credibility, GIA certifications of the same diamond may

differ significantly. In fact, GIA itself has come under scrutiny and attack for alleged bribery for falsified certifications.

29. <u>The Diamond Doctor's Policy of Full Disclosure</u>. The Diamond Doctor has had, and continues to maintain, a consistent policy of disclosing to its clients the potential for significant differences between grading and certifications from one laboratory to another. Simply put, The Diamond Doctor makes its clients aware that a certification from one lab may be perceived as being more reliable than a certification from another. These disclosures include the potential for higher appraised values for diamonds with particular certifications and the resulting retail pricing disparities.

30. The Diamond Doctor purposefully sets out to explain these differences to each of its customers. The Diamond Doctor always prices diamonds according to the type of certification it possesses because of the possibility of perceived discrepancies in the reliability of the respective certifications. The Diamond Doctor has never represented, for instance, that a diamond certified at one laboratory is the same as a diamond certified through another. Finally, The Diamond Doctor's customers enjoy the ability to receive a full money back guarantee during their lifetime or to trade a previously purchased diamonding for a diamond of equal price.

**C.    The Extortion Scheme.**

31. As detailed below, Manookian has taken what amounts to differences of opinion over how separate, independent entities grade diamonds, and contrived a legal dispute whose goal is to extort millions of dollars from its victims.

32. <u>Targeting The Diamond Doctor</u>. In October 2015, Manookian set his sights on The Diamond Doctor and began a systematic campaign on the internet and social media culminating in the attempted extortion of millions of dollars from The Diamond Doctor.

33.  <u>Harassing Websites</u>. In or around October 2015, Manookian created two websites, www.diamonddoctorlawsuit.com and www.dallasdiamonddoctorclassaction.com. The names of the websites are harassing and misleading. There is not, and never has been, a class action lawsuit against The Diamond Doctor concerning diamond grading. There is not even a single, active lawsuit against The Diamond Doctor.[1] The websites utilize The Diamond Doctor's name and photos of its location to launch broadsides that The Diamond Doctor has "cheated" and "ripped off" its customers through the sale of non-GIA certified diamonds. (App. 137 - App. 144.)  The www.diamonddoctorlawsuit.com website goes so far as to include Blank's photograph with the word "Fraud" superimposed over his face, calling him a "mastermind," and offering "stone cold proof" that The Diamond Doctor "knowingly sells overgraded diamonds." (App. 145.)

34.  The www.diamonddoctorlawsuit.com website also contains a link to excerpts of taped telephone conversations forming the essence of Manookian's disingenuous defense. The recordings consist of excerpts from Blank and Manookian's various telephone conversations in which Blank offers to hire Cummings Manookian as The Diamond Doctor's outside counsel. (App. 150.) As alluded to above and will be described in detail below, Blank only broached the subject of engaging Cummings Manookian because he believed it was the only way to end the harassment and save The Diamond Doctor and his good name and reputation.

35.  <u>Social Media</u>. Manookian increased the pressure on the Diamond Doctor through the popular social media website Facebook. On or around November 5, 2015, Manookian posted messages on the newsfeed of The Diamond Doctor's Facebook page calling The Diamond Doctor

---

[1] Since the commencement of this litigation, on March 8, March 14, March 16, May 10, May 18, and June 7, 2016, Hammervold has sent The Diamond Doctor eight demand letters pursuant to the Texas Deceptive Trade Practices Act for diamonds sold.

a "scam" and making accusations about it cheating customers. (App. 156.) Around the same time, Manookian went a step further and targeted The Diamond Doctor's employees sending Facebook messages to their private accounts, asking, "[d]o you work here? Ask David Blank if you could be personally liable for the fraudulent [sale of diamonds] . . ." (App. 157.) Manookian also sent a "FRAUD ALERT" Facebook message. (App. 158.)

36.    The Diamond Doctor's State Court Lawsuit. On October 26, 2015, The Diamond Doctor did what any business would do in the same situation. It hired an attorney to demand an end to the false attacks.  When Manookian did not stop, The Diamond Doctor, through its previous counsel, filed suit on October 30, 2015, and requested a temporary restraining order. Unfortunately, The Diamond Doctor did not obtain the relief it expected. The Court instead denied the request for a temporary restraining order and questioned its own jurisdiction moving forward. (App. 159 – App. 160.)  The Diamond Doctor nonsuited its state court lawsuit.

DIAMOND DOCTOR CONFERS WITH HIS COLLEAGUES AND FRIENDS

37.    Solomon's Advice to Blank. At about this same time, Blank was in communication with other jewelers around the country whom Manookian had targeted. Specifically, Blank spoke with Howard Solomon of Solomon Brothers in Atlanta, Georgia. Howard Solomon told Blank that someone in the jewelry business, Boaz Ramon of Nashville, had contacted his brother and partner, Anthony Solomon about a smear campaign Manookian was about to commence against Solomon Brothers. In a later conversation, Ramon advised Anthony's brother, Howard Solomon that Solomon Brothers needed to contact Manookian directly, engage Cummings Manookian, and pay it a monthly retainer. According to Ramon, Solomon Brothers needed to "get Manookian on your [Solomon Brothers'] side."  Ramon said that hiring Cummings Manookian and paying the money would stop any attacks from beginning.

38.     Howard Solomon told Blank he agreed to pay Cummings Manookian $20,000 a month for a period of five years, totaling $1.2 million. Solomon even e-mailed Blank a copy of the "Consulting/Engagement Agreement" he entered with Manookian. (App. 163 – App. 169.)

39.     Manookian's harassment of Solomon Brothers never started as a result of Howard Solomon's payment of the protection money.

40.     An internet search of "Cummings Manookian Solomon" does not turn up any websites dedicated to Cummings Manookian attacks on Solomon Brothers. Interestingly, an online report stated the website solomonbrotherslawsuit.com was registered to an internet protocol address under Cummings Manookian's control. (App. 170 – App. 189.) It is not currently active. (App. 190.)

41.     <u>Mervis's Encounters with Manookian.</u> Blank also had several discussions about Manookian with Ronald Mervis ("Mervis") of Mervis Diamond Importers in Washington, D.C. Mervis also had similar conversations with Ramon who, as detailed below, also contacted him to warn of Manookian's pending attacks on his business. On September 18, 2015, Ramon emailed Mervis about Manookian. (App. 312 – App. 314.) Ramon told Mervis that Manookian's victims can "avoid [a lawsuit] if they would call [Manookian] before." (App. 313.) The same day Ramon again warned Mervis, "the earlier [j]ewelers . . . reach out to him the less damage they have." (App. 312.) On October 2, 2015, Ramon wrote again under the subject "Don't miss the boat," and again admonished Mervis "I think they [Manookian] are going to file lawsuits and a web site in your area next week." (App. 315.) Ramon concluded: "If you can avoid it before it will be great for you." (*Id.*)

42.     Mervis did not take the bait, so, Manookian established a website smearing his company's good reputation. (App. 281 - App. 284.) Mervis later decided to correspond directly

with Manookian in an attempt to end the harassment. In an email dated December 10, 2015, Manookian threatened Mervis with the distribution of "tens of thousands of the attached brochures, as well as door hangers, scheduled to begin being distributed in Washington, D.C., Maryland, and Northern Virginia beginning this weekend" unless Mervis reached a settlement with two supposedly aggrieved former customers. (App. 316 – App. 317.)

43. Manookian proposed settlement amounts exponentially larger than any damages (assuming the claims had merit—which they did not). Nonetheless, Mervis considered paying in order to stop the publicity, stating, "[t]he amounts you're claiming, $200,000 and $100,000 . . . respectively are excessive and they have no foundation. However, we are inclined to accept as a business decision, even though we deny any wrongdoing, if this ends the continuous string of negative publicity." (App. 285.) Sensing a possible payoff, Manookian agreed to cease the attacks. "At your request . . . our firm has paused all Mervis-related advertising and suspended its related website." (App. 286.) When Mervis ultimately refused to give in to Manookian's demands, Manookian promised "an avalanche of claims over the next year" and no further settlement offers "ever . . . [j]ust lawsuits." (App. 287 - App. 288.) Then, Cummings, Manookian's law partner, interjected with copy to Mervis's lawyers: "Brian—Let's also restart our previous Internet campaign [against Mervis] in earnest tomorrow." (App. 287.) Manookian then distributed brochures in Maryland, the District of Columbia, and Virginia identical to the ones Diamond Doctor was subjected to. (App. 289.)

44. Manookian's response to Mervis' refusal to settle the bogus claims is telling. Rather than just advancing his clients' claims through litigation or publicity, Manookian threatened to continue the barrage of disparaging comments on the internet and to start distributing fliers. In other words, Manookian's proposed deal was pay-up or face continued negative publicity. The

present claims of his clients, whom he should have been advocating for first and foremost, were not part of the proposed *quid pro quo*. Presumably, the clients would get nothing. The same was true in Manookian's campaign against The Diamond Doctor. To date, neither Manookian nor Cummings Manookian has filed a single suit against Mervis.[2]

45.    <u>Other Victims</u>. Blank came to find out that Manookian has attacked other retail jewelers across the country in eerily similar fashion.

46.    <u>Golden Nugget</u>. Ramon again played a central role in Manookian's targeting the jewelry store, the Golden Nugget. Just like with Mervis Diamond Importers and Solomon Brothers, Ramon contacted the Golden Nugget's owner, Asaf Herskovitz, prior to the commencement of Manookian's attacks on Herskovitz's business. On August 12, 2015, Ramon called Herskovitz and informed him that Cummings Manookian was planning to start a negative publicity campaign which would include a website designed to instigate litigation against Golden Nugget. Ramon told Herskovitz that his business would "go through hell" and advised that he should reach out to Cummings Manookian directly and hire them with monthly retainer payments. In a subsequent email and phone call on or around August 18, 2015, Ramon again told Herskovitz to contact Cummings Manookian about the upcoming harassment campaign. On September 16, 2015, someone using the email address michaelgold@gmail.com sent Herskovitz an email with the subject "lawsuit" and a link to an active website www.goldennuggetjewelry.com. (App. 191.) The website was live and very similar to the one employed against The Diamond Doctor and other victims.

---

[2] However, Hammervold is the lead attorney in two separate consumer complaints against Mervis in Maryland state court. This is a far cry from the "avalanche" of lawsuits Manookian threatened.

47.     In a phone conversation on or around October 9, 2015, Ramon admitted to Herskovitz that Manookian's scheme amounted to "extortion and blackmail," but Golden Nugget "needed to pay" To avoid it. Ramon added that refusal to pay would result in Manookian and his firm ruining Golden Nugget's reputation.  According to Ramon, this could be avoided if Golden Nugget paid Cummings Manookian. On November 10, 2015, Ramon contacted Herskovitz a final time via text message, stating "[c]lass action is very serious." Seemingly alluding to Manookian's plans to file a class action against the Golden Nugget. (App. 192.)

48.     When Ramon could not scare Herskovitz into contacting Manookian, the campaign of harassment began. On November 18, 2015, Manookian posted a message on a Golden Nugget employee's personal Facebook page, asking "[d]o you work here? Ask if you are selling over graded Golden Nugget Jeweler diamonds." (App. 290.) Similar Facebook postings continued throughout the holiday shopping season. (App. 291.)

49.     <u>International Diamond Center</u>. Ramon also forewarned, International Diamond Center ("IDC"), about pending attacks from Manookian. Ramon text messaged his former employee currently working for IDC "If you need help with it, let me know." The message provided a link to Manookian's website targeting IDC www.internationaldiamondcenterlawsuit.com. (App. 296 – App. 299.) Manookian also established a Facebook page linking to the website and to commentary and text indicating the existence of lawsuits against IDC which do not exist. (App. 300 – App. 303.) One such link correctly notes how misleading Manookian is being, stating, "there is no formal lawsuit against IDC." (*Id.*) Finally, just like with The Diamond Doctor, Manookian posted a story on a website called "Ripoff Report" claiming that IDC defrauded its customers. (App. 304 – App. 307.)

50.     There is no explanation for how or why Ramon would know what tactics Manookian was going to unleash against Mervis, Solomon Brothers, Golden Nugget, or IDC unless he was coordinating with Manookian. Upon information and belief, Ramon has bargained with Manookian to take part in the extortion scheme by convincing fellow jewelers to pay Manookian's demands in return for some benefit—perhaps a part of any proceeds from the extortion, free representation in Ramon's previously mentioned lawsuit, or something else. Simply put, there is no other credible explanation for why Ramon would assist Manookian in his extortion scheme.

51.     <u>Padis Jewelry (San Francisco, California)</u>. The last known victim of Manookian is Padis Jewelry ("Padis") in California. Manookian set up a website accusing Padis of fraud identical to the ones previously discussed. (App. 308 – App. 311.)

DIAMOND DOCTOR TRIES TO NEGOTIATE WITH MANOOKIAN AND CUMMINGS MANOOKIAN

52.     <u>Blank Negotiated Directly with Manookian</u>. Blank listened to the input and advice he received from Howard Solomon and Mervis and considered what to do next. His first lawsuit filed by previous counsel was unsuccessful, and Manookian's attacks through the websites and Facebook continued with no end in sight. Blank believed the avalanche of negative publicity would culminate in irreparable harm to The Diamond Doctor's reputation endangering its ability to survive as a business.

53.     Simply put, Blank firmly believed his business was in jeopardy due to the ongoing negative publicity attacks perpetrated by Manookian. He had no other option than to do what his friend, Solomon, had advised: directly negotiate with Manookian to retain Cummings Manookian. In Blank's mind, paying Cummings Manookian millions of dollars would be worth preserving his

well-earned good reputation. The alternative was a destroyed business reputation he had built himself from nothing.

54.     So, indeed, as described above, Blank called Manookian and broached the subject of retaining Cummings Manookian as his new outside counsel through monthly retainers. Manookian revealed another jeweler called Diamonds Direct had also hired Cummings Manookian under similar circumstances. Manookian stated Blank would need to pay $5 million to end the negative publicity campaign. Manookian then stated that he would have to consider Blank's offer to engage Cummings Manookian further after consulting with his partner Cummings.

55.     After these initial conversations, Manookian reversed course and claimed he was not interested in The Diamond Doctor engaging Cummings Manookian. Because Blank continued to believe this was his only way out, he asked Manookian on multiple occasions to reconsider. Finally, Manookian sensed that he had Blank irretrievably hooked, re-engaged and discussed terms of $25,000 monthly retainer payments over ten years for an aggregate fee of $3 million.

56.     Manookian portrayed the proposed relationship as one between a client and its attorney. However, when The Diamond Doctor asked about legal representation in two unrelated matters, Manookian explained he was not interested in representing The Diamond Doctor for those purposes. Manookian's only interest was in collecting the $3 million payoff, not in providing actual legal counsel. In other words, Manookian's attacks would only end in return for the $3 million payment. Interestingly, any purported prospective clients in discussions with Cummings Manookian to sue The Diamond Doctor would not get any of the $3 million or be able to retain Cummings Manookian because of the "conflict" that would exist between them and the firm.

57.     On November 12, 2015, Manookian tried to seal the deal with Blank in a recorded telephone conversation:

| Blank: | Just to be on the same page, we get this agreement in place, we get funds, you'll agree never to up this campaign ever again? |
|---|---|
| Manookian: | Correct. I would not be able to. As your lawyer, I would effectively be conflicted out from doing that ever. If you want to spell that out in an agreement, I have never done that before, but we can. |
| Blank: | Brian, it's $3,000,000. I would like to. |
| Manookian: | No, I understand. It is a belt and suspenders approach, and I totally understand it. |
| Blank: | I fully understand that you can put it up [i.e., re-start the website and Facebook campaign against Diamond Doctor] at any time if [I] make any missteps or anything like that. Clearly, I am at your mercy. |

58. _Engagement Agreement_. After this call, Manookian emailed a proposed "Consulting/Engagement Agreement" (the "Manookian Agreement") to Blank. (App. 193 – App. 198.) Cleverly, the Manookian Agreement was a version another jeweler (upon information and belief, Solomon Brothers) supposedly executed with critical information concerning the payment terms and term length redacted. (_Id._) This served two purposes: (1) the ostensible acceptance by another jeweler portrayed the Manookian Agreement as part of a legitimate transaction as opposed to what it really was—the coup de grace of Manookian's extortion scheme; and (2) the redacted payment terms in the Manookian Agreement leave the victim without any written documentation of the key element of the scheme aside from Manookian's own verbal threats and activation and re-activation of the website and social media attacks. Nonetheless, Manookian did leave one critical term un-redacted—The Diamond Doctor's obligation to pay the full amount (_i.e._, $3,000,000) to Manookian even if it terminates the Manookian Agreement. (App. 198.)

59. <u>Blank Only Knew What to Offer Because of What He Had Heard from Solomon and Mervis</u>. Blank would not have known to propose that The Diamond Doctor engage Cummings Manookian through monthly retainer payments in the amounts he initially suggested (i.e., "ten, fifteen, twenty thousand dollars") over a number of years unless he had heard it first through Howard Solomon and Mervis (both of whom heard it from Ramon). Simply put, Blank would never have been willing to pay Cummings Manookian **_millions_** of dollars before any actual lawsuit had been filed but for the fact that two people he trusted in the industry told him this was a way to solve the problem of Manookian's never-ending harassment.

60. <u>Renewed Harassment</u>. Ultimately, The Diamond Doctor would not submit to the terms of Manookian's extortion and execute the Manookian Agreement. When Manookian realized The Diamond Doctor would not pay, they re-activated the websites. (App. 137 – App. 144.) In or around January 26, 2015, Manookian created his own Facebook page rather than just posting on The Diamond Doctor's own newsfeed in Facebook. (App. 199 – App. 200.) Upon information and belief, on January 19, 20, 21, 25, 26, February 24, March 3, 7, and 9, Manookian posted videos on YouTube featuring pictures of The Diamond Doctor's logo, showroom, and building exterior and including a link to Manookian and Blank's recorded telephone conversations about the engagement of Cummings Manookian as The Diamond Doctor's outside legal counsel. (App. 201 – App. 268.) The websites and other propaganda further accuse The Diamond Doctor of "fraud," "scams," "crimes," "intentional overgrading," "misrepresentations," "rip[ping] off the masses," and being found "guilty of trying to bribe a lawyer." (*Id.*)

61. Upon information and belief, on January 12, 2016, Manookian posted on www.ripoffreport.com that The Diamond Doctor had committed "heinous crimes." (App. 269 – App. 272.)

62.     On March 4, 2016, Manookian unsuccessfully tried to buy advertising time on a popular Dallas radio station 1310 AM. (App. 274 – App. 276.)

63.     On March 10, 2016, well after the commencement of this litigation, upon information and belief, Manookian contacted Blank personally via email. (App. 273.) The email came from the address haha@youareafraud.com. (*Id.*) In a clumsy attempt to mask the identity of the sender, the name associated with the address was "Bachendorf" another prominent retail jeweler and competitor of The Diamond Doctor. (*Id.*) The email contained a link to a new website www.diamonddoctorfraud.com. (App. 152 – App. 154.) The website purports to have the "Truth About The Diamond Doctor Fraud Case" and The Diamond Doctor's "crimes" and "wrongdoing." (*Id.*) It again makes the accusation The Diamond Doctor has been "supplying customers with fake certificates" and "Found Guilty of Trying to Bribe a Lawyer." (App. 153.) There is a link and transcript of Blank and Manookian's phone conversations. (App. 153 – App. 154.)

64.     Finally, Manookian distributed fliers in and around The Diamond Doctor's location and Blank's own residential neighborhood in Dallas in December 2015 and January 2016. (App. 297 – App. 280.)

65.     <u>Impact on The Diamond Doctor.</u> Needless to say, Manookian's efforts amount to nothing more than a vicious smear campaign. The Diamond Doctor and its owner Blank are not fraudsters or "heinous" criminals. They do not intentionally over grade diamonds, scam, or bribe its customers. They have not been found "guilty" of anything and there is no "fraud case" against them.

66.     The impact of Manookian's smear campaign against The Diamond Doctor has undoubtedly harmed its business. Members of the public have seen Manookian's allegations of "fraud" and are taking them seriously. A listener to the above-mentioned radio station, 1310 AM,

contacted four hosts of its various radio shows. "[C]an't listen to [D]iamond [D]octor [advertising] spots without thinking of fraud charges he's facing." (App. 277.) Furthermore, The Diamond Doctor knows of at least one customer it has lost because of Manookian's smear campaign. The potential customer stated she decided not to even consider a purchase of a $50,000 diamond from The Diamond Doctor despite her own sister's recommendation due to doubts about The Diamond Doctor's business practices after learning about the negative publicity Manookian is responsible for generating.

## V. CAUSES OF ACTION

### A. Violations of Racketeer Influenced Corrupt Organizations Act (18 U.S.C. § 1962(c)) – Manookian

The Diamond Doctor re-alleges and incorporates herein by reference each and every foregoing paragraph of this complaint as if fully set forth below.

67. <u>RICO Persons</u>. At all relevant times, The Diamond Doctor is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). At all relevant times, Manookian was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

68. <u>The RICO Enterprise</u>. Cummings Manookian is a law firm formed and operating, upon information and belief, under the laws of the state of Tennessee. Cummings Manookian's ostensible purpose is to represent clients in civil lawsuits. In reality, Cummings Manookian is much more. Cummings Manookian, as The Diamond Doctor has alleged and described in the foregoing paragraphs of this complaint, is an ongoing enterprise engaging in illegal acts. Cummings Manookian participates in the commission of extortion and other illegal acts through a sophisticated, systematic scheme of targeting retail jewelers across the country through a barrage

of false, misleading, and harassing publicity on the internet, social media, and through the distribution of fliers in the geographic locations of its victims.

69.    For the express purposes of this complaint, Cummings Manookian has targeted and continues to target The Diamond Doctor with all of the aforementioned acts including, without limitation, 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report against The Diamond Doctor and its employees, 3) sending a false, misleading, and harassing email directly to Blank (after the commencement of this litigation) under the name "Bachendorf" another Dallas area jeweler, and 4) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in detail above.

70.    Cummings Manookian is necessary to Manookian's illegal acts as described herein. Specifically, Manookian can portray his illegal acts (including, without limitation, the illegal acts of Cummings Manookian) as nothing more than a law firm soliciting clients. However, Cummings Manookian is a corrupt organization operated and managed through a pattern of racketeering activity as described more fully herein and including the extortion of victims like The Diamond Doctor who have not committed the wrongdoing of which they are accused. Finally, Manookian individually is separate and distinct from the enterprise as described herein through the commission of his illegal acts. Likewise, Mark Hammervold and Hammervold, PLC are necessary to Manookian's illegal acts as described herein because Manookian solicits clients to sue the targeted jewelers and then refers those cases to Hammervold and/or Hammervold, PLC to

prosecute, thereby avoiding the appearance of a conflict when Manookian subsequently enters into "engagement agreements" to represent the targeted jewelers as part of his extortion scheme.

71.     As for continuity, the pattern of racketeering activity satisfies either an open-ended or closed-ended standard. Under the open-ended standard, Manookian's racketeering activity has been continuous through a pattern of ongoing conduct in his ordinary course of business. As pleaded above, Manookian has regularly used Cummings Manookian to intimidate, extort, or attempt to extort multiple jewelers across the United States. Manookian is still using Cummings Manookian to collect and attempt to collect extortion payments, and therefore, poses a significant threat of continuing to do so in the future. Under the close-ended standard, Manookian's pattern of racketeering activity suffices. Upon information and belief, the pattern of racketeering activity began after Manookian first sued Ramon in 2012 and continues through today.

72.     <u>Association in Fact Enterprise</u>. Cummings Manookian, Ramon, Cummings, Manookian, Hammervold, and Hammervold, PLC are members of an association-in-fact enterprise. Cummings Manookian, Ramon, Cummings, Manookian, Hammervold, and Hammervold, PLC each have defined roles, but together they function as a unit with a common purpose: extorting millions from their victims. As described in detail above, Cummings Manookian has targeted and continues to target The Diamond Doctor and other victims across the country by: 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report; 3) transmitting false, misleading, and harassing email under the address haha@youareafraud.com and trying to portray that it was from another Dallas jeweler; and 4) distributing false, misleading, and harassing fliers in and around The Diamond

Doctor's physical location in Dallas, Texas. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor, as described in detail above.

73.     Ramon's role in the association in fact enterprise is different but no less important. As described in detail above, Ramon worked in concert with Cummings Manookian by warning victims like Mervis, Golden Nugget, IDC, and Solomon Brothers of the impending internet, social media, and flier campaigns. Ramon, then, encouraged these victims to give into Manookian's demands and pay them. Ramon is aware of the other members' roles in this scheme. Ramon and Cummings Manookian have operated and, upon information and belief, continue to operate in the fashion as described in detail above.

74.     Hammervold's role in the association in fact enterprise involves prosecuting claims against the targeted jewelers on behalf of clients Manookian solicits, so Manookian can avoid an appearance of conflict when he subsequently enters into "engagement agreements" to represent the targeted jewelers.

75.     Manookian operates and manages the association in fact described above through a pattern of racketeering activity.

76.     As for continuity, the pattern of racketeering activity satisfies either an open-ended or closed-ended standard. Under the open-ended standard, Manookian's racketeering activity has been continuous through a pattern of ongoing conduct in his ordinary course of business. As pleaded above, Manookian has regularly used the association-in-fact enterprise to intimidate, extort, or attempt to extort multiple jewelers across the country. Manookian is still using the association-in-fact enterprise to collect and attempt collect extortion payments, and therefore poses a significant threat of continuing to do so in the future. Under the close-ended standard,

Manookian's pattern of racketeering activity suffices. Upon information and belief, the pattern of racketeering activity began after Manookian first sued Ramon in 2012 and continues through today.

77.     <u>Predicate acts</u>. Manookian has engaged in a pattern of racketeering activity. Manookian conducted or participated, directly or indirectly, in the conduct, management, or operation of Cummings Manookian as an enterprise as described above through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). The Diamond Doctor has suffered and continues to suffer harm as a result of each of these predicate acts detailed below in the form of costs associated with hiring various professionals to respond to the systematic and targeted campaign of negative publicity.

78.     <u>Extortion in violation of Hobbs Act 18 U.S.C. § 1951</u>. At all times relevant to this Complaint, The Diamond Doctor was engaged in interstate commerce and in an industry that affects interstate commerce. As described in detail above, Manookian has engaged in a systematic scheme of targeting retail jewelers across the country through a barrage of false, misleading, and harassing publicity on the internet, social media, and distributed fliers in the geographic locations of its victims. For the express purposes of this complaint, Manookian has targeted and continues to target The Diamond Doctor with all of the aforementioned acts including, without limitation: 1) establishing false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) posting false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report; 3) transmitting a false, misleading, and harassing email under the address haha@youareafraud.com and trying to portray it is from another Dallas jeweler; and 4) distributing false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas.

Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described herein.

79.     Manookian's actions as described above are designed to induce the fear in The Diamond Doctor and its employees that Manookian will, among other things continue to: 1) maintain false, misleading, and harassing internet websites www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com; 2) post false, misleading, and harassing messages and videos on Facebook, YouTube, and Ripoff Report;, 3) transmit of false, misleading, and harassing emails under the address haha@youareafraud.com and portray they are from another Dallas jeweler; and 4) distribute false, misleading, and harassing fliers in and around The Diamond Doctor's physical location in Dallas, Texas, unless and until The Diamond Doctor "retains" Cummings Manookian as its outside counsel for no apparent benefit other than to halt the negative publicity campaign of intimidating and harassing falsehoods. Manookian's actions as described herein have created a reasonable fear of harm on the part of The Diamond Doctor including, without limitation, the fear of economic loss and damage to its hard-earned reputation (above and beyond the harm it has suffered already as described herein).

80.     Manookian has, thus, unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951 to the extent that Manookian attempted to obtain The Diamond Doctor's property (i.e., $25,000 per month for 10 years or $3 million), with its consent, induced by the wrongful and illegal use of actual and threatened fear of economic and reputational harm.

81.     <u>Mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343</u>. As described in detail above, Manookian has engaged in an attempt to defraud through a systematic scheme of

targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the internet, social media, e-mail, and fliers in The Diamond Doctor's geographic location. Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor as described in more detail above.

82.     In furtherance of this fraudulent scheme, and as described above, Manookian transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier without limitation the following:

    i.    Websites, www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business;

    ii.    Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

    iii.    Transmitting a false, misleading, and harassing email message designed to portray it as coming from another Dallas-based jeweler and competitor of The Diamond Doctor;

<ol type="i" start="4">
<li>Posting false, misleading, and harassing messages on the internet website Ripoff Report;</li>
<li>Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;</li>
<li>Transmitting through the U.S. mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and</li>
<li>Transmitting through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.</li>
</ol>

83. Manookian participated in the fraudulent scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

84. Upon information and belief, persons who have seen the internet websites, e-mails, Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

85. <u>Travel Act in violation of 18 U.S.C. § 1952</u>. As described in detail above, Manookian has engaged in an unlawful activity in the form of a systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing publicity on the

internet, social media, and fliers distributed in The Diamond Doctor's geographic location. Cummings Manookian has engaged in this campaign against The Diamond Doctor for the express purpose of extorting $3 million from The Diamond Doctor. In furtherance of this unlawful activity scheme, and as described above, Manookian transmitted, or caused to be transmitted, by travel, mail, or any other facility in interstate commerce in the furtherance of unlawful activity or promote, manage, establish, carry on, facilitate the promotion, management, establishment, or carrying on of any unlawful activity through the following without limitation:

i. Websites, www.diamonddoctorlawsuit.com, www.diamonddoctorclassaction.com, and www.diamonddoctorfraud.com incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business;

ii. Postings and messages on the internet website Facebook incorporating false, misleading, and harassing statements regarding The Diamond Doctor and its business some of which were directed at The Diamond Doctor's employees threatening them with personal liability for no reason other than to harass and intimidate them and The Diamond Doctor;

viii. Transmitting a false, misleading, and harassing email message designed to portray it as coming from another Dallas-based jeweler and competitor of The Diamond Doctor;

iii. Posting false, misleading, and harassing messages on the internet website Ripoff Report;

**THE DIAMOND DOCTOR'S SECOND AMENDED**
**COMPLAINT**                                                                 30

    iv.        Posting videos on the internet website YouTube incorporating false, misleading, and harassing statements regarding The Diamond Doctor;

    v.        Transmitting through the U.S. mail system, other interstate carrier, or electronic mail of fliers for distribution containing false and misleading statements in and around The Diamond Doctor's geographic location in Dallas, Texas; and

    vi.      Transmitting through electronic mail of the Manookian Agreement and other communications concerning the Manookian Agreement for the express purpose of inducing The Diamond Doctor to execute it and pay Manookian $3 million.

86.    Manookian participated in the unlawful activity scheme or artifice knowingly, willfully, and with specific intent to generate fear on the part of The Diamond Doctor such that The Diamond Doctor would execute the Manookian Agreement and pay Manookian $3 million.

87.    Upon information and belief, persons who have seen the internet websites, e-mail, Facebook, YouTube, and Ripoff Report postings, messages, and videos, and the fliers distributed in Dallas, Texas, have relied on their false and misleading contents to the harm and detriment of The Diamond Doctor.

88.    <u>Tenn. Code Ann. § 39-14-112</u>. Manookian has violated the applicable Tennessee statute through his wrongful and illegal attempts to use coercion upon The Diamond Doctor with the intent to obtain its property via executing the Manookian Agreement and paying Manookian $3 million which rightfully belongs to The Diamond Doctor. Manookian's actions constitute extortion through his coercion and generating fear on the part of The Diamond Doctor through

Manookian's campaign of false, misleading, and harassing publicity as described in detail above constitutes violations of Tennessee law.

89. The Diamond Doctor has suffered injury in its business and property due to the violations of 18 U.S.C. § 1962 as detailed herein and above and, thus, seek recovery of threefold its damages, cost of suit, and reasonable attorneys' fees. Specifically, The Diamond Doctor has suffered and continues to suffer harm as a result of each of the aforementioned predicate acts in the form of: a) costs associated with hiring professionals (specifically multiple public relations firms) to respond to the systematic and targeted campaign of negative publicity currently amounting to $123,000; b) loss of business reputation, value, and goodwill; and c) lost profits.

**B.     Business Disparagement – Manookian and Cummings Manookian**

90. As described in detail above, Manookian and Cummings Manookian's systematic scheme of targeting The Diamond Doctor through a barrage of false, misleading, and harassing negative publicity on the internet, social media, and distributed fliers in The Diamond Doctor's geographic location contain disparaging words concerning The Diamond Doctor's economic interests. The content of this publicity on internet websites www.diamonddoctorlawsuit.com and www.diamonddoctorclassaction.com, social media websites Facebook, YouTube, and Ripoff Report, and hard copy fliers are false and published with malice. Manookian and Cummings Manookian made and continue to make these publications without privilege, and the same have caused special damages in the form of: a) costs associated with hiring professionals (specifically multiple public relations firms) to respond to the systematic and targeted campaign of negative publicity currently amounting to $123,000; b) loss of business reputation, value, and goodwill; and c) lost profits.

## C.  Tortious Interference with Prospective Business Relations – Manookian and Cummings Manookian

91.     Manookian and Cummings Manookian's false and malicious public attacks against The Diamond Doctor have tortiously interfered with The Diamond Doctor's prospective business relationships.  Indeed, there is a reasonable probability that The Diamond Doctor would have entered into a business relationship with at least one customer but for Manookian and Cummings Manookian's false attack campaign as described in detail herein.  Moreover, Manookian and Cummings Manookian's conduct is independently tortious and unlawful, in that their public statements about The Diamond Doctor are false and defamatory and were made in furtherance of an unlawful civil conspiracy as described herein.

92.     In addition, Manookian's pattern of conduct as described herein demonstrates that he embarked on his attack campaign with a conscious desire to prevent The Diamond Doctor from entering into business relationships with prospective customers and/or with knowledge that interference with The Diamond Doctor's prospective business relationships was certain or substantially certain to occur. Finally, The Diamond Doctor has suffered actual harm as a result of Manookian's tortious interference in the form of at least one lost customer and lost profits.

## D.  Defamation – Manookian and Cummings Manookian

93.     Manookian and Cummings Manookian have also defamed The Diamond Doctor by publishing multiple false statements about The Diamond Doctor and its owner in various public forums, including YouTube and Facebook.  For instance, Manookian and Cummings Manookian have falsely stated that The Diamond Doctor "trie[d] to bribe a lawyer," that The Diamond Doctor's owner "has been found bribing a lawyer for millions," and that The Diamond Doctor's owner has been "found guilty of trying to bribe a lawyer." Manookian and Cummings Manookian

made these false statements with knowledge that they were false, with reckless disregard for their truth or falsity, or, at minimum, negligently. Moreover, because these statements falsely accuse The Diamond Doctor of committing a crime, they are defamatory *per se*. The Diamond Doctor has suffered substantial economic and non-economic harm as a result of Manookian and Cummings Manookian's false statements, including harm to its reputation and goodwill.

## E.  Civil Conspiracy

94.     The extortion scheme and false attack campaign perpetrated by Manookian, Cummings, Ramon, Hammervold, Hammervold, PLC and other yet to be identified, unnamed persons, constitutes a civil conspiracy under Texas law.  Specifically, Manookian, Cummings, Ramon, Hammervold, Hammervold, PLC and others yet to be identified, unnamed persons have agreed and conspired to smear the business names and ownership of various jewelry retailers across the country including, without limitation, The Diamond Doctor, and extort millions of dollars from them.

95.     As set forth above, these conspirators have committed one or more unlawful acts in furtherance of their unlawful objectives, and The Diamond Doctor has suffered substantial damages as a proximate result of their actions.

## VI.  PRAYER FOR RELIEF

Plaintiff The Diamond Consortium, Inc. d/b/a The Diamond Doctor prays that this Court:

96.     Enter judgment in favor of The Diamond Doctor and against Manookian, Hammervold of Hammervold, PLC and all other named Defendants on all of The Diamond Doctor's claims and award The Diamond Doctor trebled actual and economic damages due to Manookian and Hammervold of Hammervold, PLC's willful conduct as described herein and exemplary and punitive damages; and

97. Award The Diamond Doctor such other and further relief that this Court deems just and proper. Pursuant to Fed. R. Civ. P. R. 38, The Diamond Doctor demands a trial by jury for all issues triable by jury.

Respectfully submitted,

**STECKLER GRESHAM COCHRAN**

*/s/ Bruce W. Steckler*
Bruce W. Steckler
Texas Bar No. 00785039
Stuart Cochran
Texas Bar No. 24027936
Stefani S. Eisenstat
Texas Bar No. 00788417
12720 Hillcrest Road – Suite 1045
Dallas, TX 75230
Telephone: 972-387-4040
Facsimile: 972-387-4041
bruce@stecklerlaw.com
stuart@stecklerlaw.com
stefani@stecklerlaw.com

**JOHNSTON TOBEY BARUCH, P.C.**
Randy Johnston
State Bar No. 10834400
3308 Oak Grove Avenue
Dallas, TX 75204
Telephone: 214-741-6260
Facsimile: 214-741-6248
randy@jtlaw.com

**SANDERS, O'HANLON, MOTLEY, YOUNG, & GALLARDO, PLLC**
Roger Sanders
State Bar No. 17604700
111 S. Travis Street
Sherman, TX 75090
Telephone: 903-892-9133
Facsimile: 903-892-4302
rsanders@somlaw.net

**SETTLEPOU**
Braden M. Wayne
State Bar No. 24075247
3333 Lee Parkway, Eighth Floor
Dallas, TX 75219
Telephone:  214-520-3300
Facsimile:  214-526-4145
bwayne@settlepou.com


**FEE, SMITH, SHARP & VITULLO, LLP**
Howard J. Klatsky
State Bar No. 00786024
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, TX 75240-5019
Telephone: 972-934-9100
Facsimile:  972-934-9200
hklatsky@feesmith.com


**ATTORNEYS FOR PLAINTIFFS DIAMOND
CONSORTIUM, INC. D/B/A THE DIAMOND
DOCTOR, AND DAVID BLANK**

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 14, 2016, he served the foregoing Amended Complaint on all counsel of record via the Court's ECF system.

The undersigned has requested a summons to be issued to serve the following defendants via process server:

Mark Hammervold
1758 North Artesian Avenue
Chicago, IL 60647

Hammervold, PLC
c/o InCorp Services, Inc.
216 Centerview Drive
Suite 317
Brentwood, TN 37027-3226

*/s/ Bruce W. Steckler*
Bruce W. Steckler