deposition testimonies of Dean Chase and Sandra Chase. (Hr'g Tr. 211:2-212:16; 233:2-7, Sept. 23, 2016; Hr'g Tr. 19:13-19, Nov. 9, 2017; Tr. Exhibit 2, Nov. 9, 2016.)

50. In the NewsChannel 5 WTVF story, from the 0:00-0:17, 1:41-1:49, 2:31-3:20, 3:34-4:11, and 5:19-5:49 minute marks, the video recordings of the depositions of Dean Chase and Sandra Chase are shown and discussed by Phil Williams. (Tr. Exhibit 2, Nov. 9, 2017.) Additionally, from the 2:00-2:17, 4:20-4:46, 5:10-5:19, and 5:58-6:13 minute marks, portions of the text messages that were previously included as part of "Exhibit I" of Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief* are shown and discussed by Phil Williams. (*Id.*)

## H.    Findings of Fact as to the Subsequent Proceedings

51. On February 25, 2016, the Non-Parties filed a *Motion for Sanctions* based primarily on two violations of the *Agreed Protective Order* and the Court's *Orders*: (1) the dissemination of the Non-Parties' confidential discovery materials and deposition testimonies to the news media; and (2) the use of the Non-Parties' confidential discovery materials in the *King v. Chase* case and other threatened litigation. The Non-Parties requested the Court conduct an investigation to determine which of the parties and/or counsel for the parties violated the *Agreed Protective Order* and subsequent Court *Orders* and to levy all necessary sanctions against the violator(s).

52. On March 7, 2016, Miller & Martin, PLC and Defendant Cho filed a *Response* to the *Non-Parties' Motion for Sanctions* that contained the following sworn representations from both Bob Parsley, Esq. as an Officer of the Court and Defendant Cho: (1) they did not disseminate, directly or indirectly, the Non-Parties' confidential discovery

materials to the media, the public, or any other prohibited persons and (2) they do not know who disseminated any confidential discovery materials to the news media. (*See Defendant Andy Cho's Response to Various Motions Set for Hearing on March 10, 2016.*)

53. On March 7, 2016, David T. Hooper, Esq. of Hooper, Zinn & McNamee, PLLC and Defendant Ritzen, filed a *Response* to the *Non-Parties' Motion for Sanctions* that contained the following sworn representations from both David Hooper as an Officer of the Court and Defendant Ritzen:(1) they did not disseminate, directly or indirectly, the Non-Parties' confidential discovery materials to the media, the public, or any other prohibited personal and (2) they do not know who disseminated any confidential discovery materials to the news media. (*Response of Jason Ritzen to Motion for Sanctions of Non-Parties Dean Chase, Sandra Chase, and D.F. Chase, Inc.* of March 7, 2016.)

54. On March 7, 2016, Mr. Manookian, together with the assistance of Mr. Hammervold, executed a different strategy, and began what this Court can only describe as a knowing, willful, and intentional course of conduct to deceive and defraud this Court in order to avoid punishment for their actions and to gain personal advantage in this case and the *King v. Chase* lawsuit. First, Mr. Manookian filed a *Motion to Strike and Response to Non-Parties' Motion for Sanctions*, asserting the Non-Parties' *Motion for Sanctions* was in reality a petition for contempt that should be stricken because the *Motion* does not even identify who the Non-Parties believe should be held in contempt. Also, Mr. Manookian argued the Court had "no authority" to sanction the offending individuals.

55. Second, in conjunction with Mr. Manookian's filing of his *Motion to Strike*, Mr. Hammervold failed to file a response to the Non-Parties' *Motion for Sanctions* prior to the Court-ordered March 10, 2016 hearing date.  Mr. Hammervold never asked for an extension of time to file his ordered response.

56. Third, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions*.  However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.)  Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.)  It is noteworthy Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-24.)  Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016.)

57. After oral arguments, this Court explained it did not wish to rule on the *Motion for Sanctions* at the present time, stating:

> But I really think I want to give everyone an opportunity either to certify they had nothing to do with it or come forward, say, "Yeah, I did."

This should not have to be an investigation. Really shouldn't. If it involves lawyers violating an order, the Court should not have to be required to do that. But if that's what it takes, that's what we'll do. I believe that a lawyer should, as a member of the bar -- and under some very stringent rules and regulations, should certify that they had nothing to do with it. If they cannot, then they simply cannot.

(*Id.* at p. 48:20-49:7.)

58. Upon review of the *Motion for Sanctions*, the Court fully explained to all of the attorneys the Court should not be required to investigate these types of situations. Thus, the Court strongly urged and implored all of the attorneys, as officers of the Court, to come forward and admit to violating the *Agreed Protective Order* and the Court's subsequent *Orders*. Regrettably, the guilty party(ies) remained silent, refused come forward and to tell the truth, and continued to actively perpetrate a continuing fraud upon this Court, the attorneys, and the parties in this case and thus traveled down an expensive and unnecessary path to uncover the truth, despite this Court's adamant attempts to persuade the guilty party(ies) to admit to their violations of the Court's *Orders* to prevent an extremely time-consuming project for this Court and the litigants, not to mention an expensive undertaking for the Non-Parties.[26]

59. Accordingly, the Court took the *Non-Parties' Motions for Sanctions* under advisement to begin a lengthy and time-consuming, fact-finding review of the evidence and issue a written order which would set forth the result of the Court's review into the Non-Parties' *Motion for Sanctions*.

60. On March 17, 2016, Mr. Hammervold filed a *Supplemental Response to NonParties* [sic] *Motion for Sanctions* on behalf of Defendants, Lovrenovic, Bryan Everett, Susan

---

[26] As Senator Howard Henry Baker, Jr., a former Republican United States Senator from Tennessee, who served as the Senate Majority Leader and White House Chief of Staff under President Ronald Reagan, and who was also the ranking minority member of the Senate committee which investigated the Watergate scandal, stated, "[i]t is almost always the cover-up rather than the event that causes trouble."

Martin, and Clayton McKenzie. In the *Response*, Mr. Hammervold stated as an Officer of the Court: (1) he had not disseminated any of the Non-Parties' confidential discovery materials or depositions to the media, any unauthorized third party, or to his clients; and (2) asserted his and Mr. Manookian's claims that the use of the Non-Parties' confidential discovery materials in *King v. Chase* were not wrongful because such litigation should be considered "future related litigation" under the *Agreed Protective Order.*[27]

61. On March 17, 2016, Mr. Manookian filed (*in camera* with the Court only) a *Declaration* under penalty of perjury, to which Mr. Manookian stated (1) he "had not disseminated confidential discovery materials in this case in violation of a court order;" (emphasis added) (2) that between October 2, 2015 through October 8, 2015, he had given and/or discussed certain of the Non-Parties' discovery materials to/with David Raybin, Kim Hodde, and Eli Richardson, three attorneys who do not represent any of the Parties in this case, as well as law enforcement; and (3) he was only disclosing such dissemination because it prevented him from "broadly certify[ing] that I have not disseminated portions of the Non-Parties' discovery materials to third parties." (*Declaration of Brian Manookian* filed In-Camera on March 17, 2016.)

62. At this time in the proceedings, Mr. Manookian had the opportunity to come forward and provide to the Court information as to how the media received the confidential materials. Instead, Mr. Manookian submitted to this Court the only people he had

---

[27] Mr. Hammervold contended the *Agreed Protective Order* permitted the use of protected materials in "future related litigation." Thus, he submitted the *King v. Chase* case constituted "future related litigation." However, the Court notes this was also *after* Mr. Manookian argued to Chancellor Lyle in the *King v. Chase* case in Davidson County the cases were not related. (*See* numbered ¶ 41 above; Tr. Exhibit 1, Nov. 9, 2017.)

disclosed the confidential material to were with the three attorneys mentioned above and law enforcement. However, as will be thoroughly examined below, this was a complete and blatant lie made under oath (with the penalty of perjury), which is evident by Mr. Manookian's subsequent admission to this Court at the evidentiary hearing on September 23, 2016, that he did release the confidential information to the news media.

63. On March 29, 2016, the Court entered an *Order* on the Non-Parties' *Motion for Sanctions*, finding the allegations in the Non-Parties' *Motion* were "supported by fact and credible affidavit testimony, warranting serious consideration by the Court." (*Order* of March 29, 2016, at p. 1-2.) Furthermore, the Court declined at that time to grant the Non-Parties' *Motion for Sanctions*, but instead ruled the Non-Parties should file detailed motions for sanctions and/or petitions for contempt if they wished to pursue the matter at a later date. (*Id.*)

## I.   Findings of Fact as to the Non-Parties' *Petition for Contempt and Motion for Sanctions* of April 11, 2016

64. On April 11, 2016, the Non-Parties filed their *Petition for Civil Contempt and Motion for Sanctions* (hereinafter referred collectively as the "*Petitions*") against Mr. Manookian and Mr. Hammervold, as well as against their respective law firms.[28]

65. In furtherance of Mr. Manookian's and Mr. Hammervold's attempts to defraud the Court, on April 21, 2016, Mr. Manookian filed a *Response* to the Non-Parties' *Petitions*, arguing the *Petitions* should be denied because they constitute "**rank unsupported hypothesizing**," "**speculation and shameless, Johnny-come-lately histrionics**," and "**assorted real and imagined conduct**." (emphasis added) (*Brian*

---

[28] The Court notes the Non-Parties, CK Global, LLC and NV Music Row, LLC, also filed a separate *Motion for Sanctions* on April 11, 2016.

*Manookian and Cummings Manookian PLC's Response to Non-Parties' Petition for Contempt and Motion for Sanctions* of April 21, 2016, at p. 1-2; 8.) On that same day, Mr. Hammervold also filed a *Response to the Non-Parties Petitions*, in which Mr. Hammervold noted his previous representations he had not disclosed any materials to the media or third parties and added he did "**not know how the media obtained the protected materials**." (Tr. Exhibit 23, n. 2, Sept. 23, 2016) (emphasis added).   Also, Mr. Hammervold represented he had "**not disclosed, referenced, filed, or otherwise 'used'** *any* **of the Protected Materials that the Non-Parties (mass) designated as confidential in the *King v. Chase* case**." (*Id.* at p.1.) (emphasis added).

66. After the conclusion of the proof in this matter and ample time to thoroughly examine the evidence, the Court has been utterly dumbfounded by Mr. Manookian's willingness to attempt to mislead the Court from uncovering his violations of the Court's *Orders* by any means necessary, and even to go so far, as he did here, to claim the Non-Parties' *Petitions* were merely "rank unsupported hypothesizing" when he very well knew he was the one who released the information to the news media. Also, the Court notes at this point Mr. Hammervold lied to the Court because he and Mr. Manookian "used" the confidential material in their representation of Mr. King in the *King v. Chase* case, which he was co-counsel with Mr. Manookian.[29]

---

[29] *See* numbered ¶¶ 32-41 above (showing Mr. Manookian's and Mr. Hammervold's use of the confidential material in their representation of Mr. King.)

J.    **Findings of Fact Regarding Evidentiary Hearing of September 23, 2016**

67. On September 23, 2016, the Court held the first day of the evidentiary hearing on the Non-Parties' *Petitions*. Prior to the beginning of the hearing, the Court denied *Respondents Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* filed on September 16, 2016. In their *Joint Motion to Dismiss*, Mr. Manookian and Mr. Hammervold argued the Non-Parties' *Petition* was a "circus-like mass-inquisition" and "chas[ing] a wild goose" but also that it was "abundantly clear that [the Non-Parties] have no information to support their speculative allegations." (*Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16 , 2016, p. 2-3.)

68. Once again, Mr. Manookian and Mr. Hammervold continued their ongoing fraud upon the Court by their adamant insistence the investigation into the release of the confidential information was nothing more than a "wild goose chase." However, this Court finds, based upon Mr. Manookian's own testimony below, the apparent "wild goose" had been caught.

(1)    **Mr. Manookian's Testimony**

69. At the hearing on September 23, 2016, Mr. Manookian was placed under oath and gave the following testimony in response to cross-examination: (1) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials to General Funk on September 1, 2015;[30] (2) Mr. Manookian admitted he disclosed

---

[30] (Hr'g Tr. 109:13-110:11, Sept. 23, 2016; Tr. Exhibit 4, Sept. 23, 2016.)

portions of the Non-Parties' confidential discovery materials and deposition testimonies to Mr. Finley of News Channel 4 WSVM; however, Mr. Manookian claimed he physically delivered the materials to Mr. Finley sometime between October 4, 2015 through October 6, 2015;[31] (3) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials and deposition testimonies to Phil Williams of News Channel 5 WTVF. However, Mr. Manookian claimed he emailed the deposition testimonies to Mr. Williams on October 6, 2015, but he hand-delivered the video portions of the confidential discovery materials in the same time period;[32] (4) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential discovery materials and deposition testimonies to Jim Ridley at the *Nashville Scene* between October 4-6, 2015, and he physically delivered the materials to Mr. Ridley;[33] (5) Mr. Manookian admitted he disclosed portions of the Non-Parties' confidential deposition testimonies to attorneys David Raybin, Kim Hodde, and Eli Richardson in the same early October 2015 period because he wanted to find out from them if he had an affirmative obligation to present such information to law enforcement;[34] Mr. Manookian failed to advise any of these attorneys about the *Agreed Protective Order* when seeking such advice, yet, each attorney, at least according to Mr. Manookian, still advised him he did not have an affirmative obligation to disclose the Non-Parties' confidential deposition testimonies to law enforcement;[35] and (6) Mr. Manookian testified he already disclosed portions of the Non-Parties' confidential deposition testimonies to the U.S.

---

[31] (Hr'g Tr. 107:3-10; 159:20-160:13; 161:5-10, Sept. 23, 2016.)
[32] (Hr'g Tr. 107:11-17; 160:14-25; 161:5-10, Sept. 23, 2016.)
[33] (Hr'g Tr. 107:18-24; 108:2-4, Sept. 23, 2016.)
[34] (Hr'g Tr. 126:7-127:13, Sept. 23, 2016.)
[35] (*Id.*)

Attorney's Office and Federal Bureau of Investigation ("FBI") on October 4, 2015, after he had consulted with his attorney, if in fact Mr. Manookian can be believed as to his assertions.[36]

70. Mr. Manookian provided no credible information in any form to support his statements, and the Court seriously doubts the veracity of Mr. Manookian's statements set forth in numbered paragraph 69 above.

### (2)   Mr. Hammervold's Testimony

71. At the hearing on September 23, 2016, Mr. Hammervold was placed under oath and gave the following testimony in response to cross-examination: (1) Mr. Hammervold testified he learned Mr. Manookian had given the Non-Parties' confidential documents and deposition testimonies to the news media a few days before the hearing on September 23, 2016;[37] (2) Mr. Hammervold testified, prior to his new found knowledge of Mr. Manookian's disclosure before the hearing, he had never asked Mr. Manookian, his co-counsel, whether he gave the confidential documents or the deposition videos to the media;[38] (3) Mr. Hammervold testified he was acting as co-counsel with Mr. Manookian when Mr. Manookian explicitly sent emails relating to confidential documents to opposing counsel in the *King v. Chase* case and when Mr. Manookian and Mr. McGuire cited these confidential documents at a

---

[36] (Hr'g Tr. 124:17-21, Sept. 23, 2016.)

[37] (Hr'g Tr. 257:24-258:14, Sept. 23, 2016.) Based upon Mr. Hammervold's testimony of only finding out about Mr. Manookian's disclosure of the confidential information a few days prior to the hearing, the Court is perplexed as to why Mr. Hammervold did not amend, strike, or make a statement at the outset of the hearing correcting his *Joint Motion to Dismiss,* which included assertions the *Petitions* were futile and unsubstantiated. Instead of taking such actions, Mr. Hammervold stood by his *Joint Motion to Dismiss,* which included assertions of which he knew to be false.

[38] (Hr'g Tr. 257:24-258:2, Sept. 23, 2016.)

meeting with opposing counsel;[39] and (3) Mr. Hammervold admitted Mr. Manookian, with Mr. Hammervold as his co-counsel, had filed in *King v. Chase* a copy of the Agreement of Partnership of NV Partners, which had been produced to them by the Non-Parties in this present case and had been marked confidential pursuant to the *Agreed Protective Order* and subsequent *Orders* of this Court on October 20, 2015 and October 30, 2015.[40]

### K.   Findings of Fact Regarding Attempts to Conclude Evidentiary Hearing on the Petitions

72. The evidentiary hearing on the *Petitions* was not completed on September 23, 2016, and the Court scheduled the second day of the hearing for November 7, 2016 to permit Mr. Manookian and Mr. Hammervold to introduce additional evidence in their defense.

73. Regrettably, this case was set to be heard after another case also set on November 7, 2016, which inevitably exceeded its allotted time. Thus, the second day set for the remainder of the evidentiary hearing did not resume on November 7, 2016.

74. After three months of delay, on February 16, 2017, the Non-Parties filed the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions*. This *Motion* was set to be heard on March 2, 2017.[41]

---

[39] (Hr'g Tr. 156:19-159:2; 267:2-4; 269:5-272:7; 289;21-24; 291:8-19; 292:22-24, Sept. 23, 2016: Tr. Exhibits 13, 15, and 16, Sept. 23, 2016.)

[40] (Hr'g Tr. 266:23-267:122; 287:24-289:20, Sept. 23, 2016; Tr. Exhibit 17, Sept. 23, 2016.) The Court notes Mr. Hammervold pointed out Mr. King is a signatory to this Agreement, and he believed Mr. King was entitled to use the document in the *King v. Chase* case in the Davidson County Chancery Court.

[41] The *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions* was "specially set" by this Court to be heard on March 2, 2017 at 9:00 a.m. via an email from this Court's Judicial Legal Assistant, Deborah M. Rubenstein, PLS, to all counsel of record dated February 3, 2017 at 11:28 a.m., a copy of which is annexed hereto as **Exhibit "A"** and made a part hereof. This Court never received any communication in any form whatsoever by email, letter, or in any other way through pleadings or otherwise stating that either Mr. Manookian or Mr. Hammervold would be attending the hearing on March 2, 2017. This Court was convinced the non-communication from both attorneys was yet another delay tactic. Mr. Hammervold never responded to Mr. Malone's numerous

75. On March 2, 2017, the Court held a hearing on the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions*. However, both Mr. Manookian and Mr. Hammervold failed to appear. In an attempt to give Mr. Manookian and Mr. Hammervold every opportunity to be heard regarding the evidentiary hearing, the Court temporarily suspended the hearing to reach Mr. Manookian and Mr. Hammervold and inquire as to their absence. Mrs. Deborah Rubenstein, this Court's Judicial Legal Assistant (hereinafter referred to as "Mrs. Rubenstein"), acting on behalf of the Court and pursuant to the direction of the Court, vigorously attempted to contact Mr. Manookian and Mr. Hammervold to discover any reason for their failures to appear. (*Notice of Filing* of April 26, 2017, Exhibit C, Hr'g Tr. 19:11-22:18; 24:2-27:17, Mar. 2, 2017.) Mrs. Rubenstein sent emails to the known email addresses owned by Mr. Manookian and Mr. Hammervold. (*Id.* at 26:1-27:16.) Despite this Court's efforts to contact Mr. Manookian and Mr. Hammervold by leaving numerous telephone messages as well as emails, neither Mr. Manookian nor anyone working on his behalf responded to confirm why he failed to appear. (*Id.*)

76. Mrs. Rubenstein was eventually able to make contact with Mr. Hammervold. (*Id.* at 27:18-29:4.) Mr. Hammervold, who was in Chicago, Illinois, at the time of the 10:20 a.m. phone call with Mrs. Rubenstein, represented to Mrs. Rubenstein he (Mr.

---

attempts to set this matter for hearing. Based upon Mr. Malone's statements in *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanctions; or, Alternatively, for the Court to Set a Date for Continuation of the Hearing* and his attempts to coordinate a date by agreement received absolutely no cooperation from Mr. Manookian or Mr. Hammervold. Therefore, this Court allowed the hearing date to remain on March 2, 2017. It should be clearly known the *Non-Parties' Motion* was properly noticed by counsel for Dean Chase, Sandra Chase, and D. F. Chase, Inc., Mr. Gayle Malone, in said *Motion* pursuant to the Williamson County Local Rules of Practice of the 21st Judicial District, with the *Motion* including the required Certificate of Service to all counsel of record and setting forth the hearing date of **March 2, 2017**.

Hammervold) was not able to make the hearing in this matter because he had a "conflict" with a hearing set in Dallas, Texas that same morning which he planned to attend, but the Dallas hearing had been cancelled earlier in the day. (*Id.* at 28:7-29:4.)

77. When Mrs. Rubenstein asked Mr. Hammervold when the hearing in Dallas, Texas, was to take place that morning and how he planned to attend such a hearing if he was in Chicago, Illinois, inexplicably, he had no answer for her. (*Id.* at 27:18-31:3.) Mr. Hammervold eventually agreed to send an email to Mrs. Rubenstein substantiating his representations. (*Id.*) Consequently, the email Mr. Hammervold sent Mrs. Rubenstein indicated the hearing he had planned to attend in Dallas, Texas, had been cancelled that morning at 7:11 a.m. (*See Notice of Filing* of March 7, 2017, Exhibit B.) The email also indicated the hearing to which Mr. Hammervold was to attend was set to begin at 9:00 a.m. in Dallas, Texas. (*Id.*) Thus, by Mr. Hammervold's own explanation, he was unable to attend this Court's hearing because he had a "conflict" with another hearing set in Dallas, Texas at 9:00 a.m. However, the Dallas, Texas hearing was cancelled at 7:11 a.m., and Mr. Hammervold was actually in Chicago, Illinois at the time of the cancellation of the hearing scheduled in Dallas, Texas, which obviously makes no sense.

78. Based upon the conflicting evidence that Mr. Hammervold was in Chicago, Illinois at the time of Mrs. Rubenstein's phone call at 10:20 a.m. CDT on March 2, 2017, Mr. Hammervold submitted to this Court he could not attend this Court's hearing due to another hearing in Dallas, Texas, nearly 800 miles away from his location, at 9:00 a.m. CDT, which was in fact only cancelled at 7:11 a.m. CDT that morning [March 2,

2017], the Court is unconvinced of Mr. Hammervold's excuse. Mr. Hammervold's representations to the Court through Mrs. Rubenstein simply make no sense. The Court finds this to be another instance of Mr. Hammervold's failing to be honest with the Court and an attempt to deceive the Court from his wrongful actions.

79. Despite Mr. Manookian's and Mr. Hammervold's unexplained absences from the hearing on March 2, 2017, the Court once again, as it had on numerous previous occasions, gave Mr. Manookian and Mr. Hammervold the benefit of the growing doubt about their honesty with this Court. The Court declined to rule on the *Non-Parties' Motion to Close Liability Hearing on Non-Parties' Petition for Contempt and Motion for Sanction* until Mr. Manookian and Mr. Hammervold had the opportunity to be fully heard. The Court reset the hearing for oral arguments on April 19, 2017.

80. On April 19, 2017, at 8:00 a.m., Mr. Manookian filed his first *Motion to Disqualify* minutes prior to the hearing on the same day, April 19, 2017, at 8:15 a.m. Unfortunately, the Court had to adjourn the anticipated hearing, pursuant to Tennessee Supreme Court Rule 10B.

81. On May 23, 2017, this Court filed *Court's Response to Motion to Disqualify* denying Mr. Manookian's *Motion to Disqualify* filed April 19, 2017. Mr. Manookian appealed this Court's denial of his *Motion to Disqualify* of April 19, 2017 to the Tennessee Court of Appeals, and on August 29, 2017, the Tennessee Court of Appeals affirmed this Court's denial. (*See* Tennessee Court of Appeals Opinion, Aug. 29, 2017 in Case No. M2017-01192-COA-T10B-CV.) It is noteworthy, when Mr. Manookian filed his *Motion to Disqualify* on April 19, 2017, he gave no prior notice such a motion was going to be filed. Instead, he waited minutes prior to the hearing to file his *Motion to*

*Disqualify* all in an effort to delay this lawsuit based upon reasons in his first *Motion to Disqualify*, as will further be explained in more detail below under section (1) Mr. Manookian's credibility, beginning on p. 58, based upon the false and made-up reasons provided by Mr. Manookian, totally contrary to the explicit requirements of Supreme Court Rule 10B. As will be seen below under section (1) Mr. Manookian's credibility, beginning on p. 58, Mr. Manookian was clearly "gaming the system" by using the rules and procedures meant to protect the order and integrity of our legal system to manipulate the system for his own personal desired outcome.

82. On November 9, 2017, immediately prior to the scheduled hearing which was to begin at 9:00 a.m. on the same day [November 9, 2017], Mr. Manookian filed yet another *Motion to Disqualify* this Court. The second *Motion to Disqualify*, which is stamped filed with the Circuit Court Clerk's Office, bears the date and time of "2017 NOV 9 AM 8:14," again, as in his first *Motion to Disqualify*, just minutes before the hearing was to be conducted at 9:00 a.m., despite the fact Mr. Manookian had eight months from the last hearing date of March 2, 2017, which he and Mr. Hammervold failed to appear, to November 9, 2017, to file his *Motion to Disqualify*, he waited until the last minute of the day of the hearing to file his second *Motion to Disqualify* without giving anyone any prior notice such a motion was being filed. As will be set forth below under section (1) Mr. Manookian's credibility, beginning on p. 62, as to the second *Motion to Disqualify*, based upon the bogus statements made in Mr. Manookian's second request to disqualify this Court, Mr. Manookian was once again "gaming the system" by using the rules and procedures meant to protect the order and integrity of our legal system to manipulate the system for his own personal

desired outcome.  Upon receipt of the *Motion to Disqualify* at 8:14 a.m., the Court

was forced to postpone the hearing for four hours (the attorneys and/or parties

waited in the courtroom).

83. At 1:01 p.m. on November 9, 2017, this Court entered *Court's Response to Second*

*Motion to Disqualify* in response to Mr. Manookian's second *Motion to Disqualify*

filed on the same day, November 9, 2017, at 8:14 a.m., denying the *Motion to*

*Disqualify*, which read, in pertinent part, as follows:

> [T]he Court can draw no other conclusion than good cause is presented,
> which would lead any reasonable personal to conclude that the motions to
> disqualify and the means stated therein along with the inordinate delay
> and the timing of the filing of the *Motion* leads to only one conclusion, that
> the *Motion* is being used in an improper manner and not in conformity with
> the purpose and rules of the Supreme Court Rules, Rule 10B.

The final day of the evidentiary hearing then proceeded to commence.

### L.   Findings of Fact of the Hearing on November 9, 2017

84. After the Tennessee Court of Appeals affirmed the Court's ruling on the *Motion to*

*Disqualify*, this Court set the final hearing on Non-Parties' *Petitions* for November 9,

2017 at 9:00 a.m., with a pre-trial conference set for November 3, 2017 at 8:00 a.m.

85. On November 3, 2017, Mr. Manookian and Mr. Hammervold appeared for the pre-

trial hearing and an *Order* was entered on various evidentiary issues.

86. On November 9, 2017, the Court held the second day of the evidentiary hearing. At

the hearing, Mr. Manookian and Mr. Hammervold inexplicably chose not to present

any evidence in their defense. Such a decision is surprising to the Court because of

Mr. Manookian's adamant testimony, whereby he claimed to have sent the

confidential information to members of the news media by email, which could have

assisted the Court in determining when or even if he violated the Court's *Orders*.

Nonetheless, the evidence presented at the hearing was primarily related to the Non-Parties' claimed damages, which were the Non-Parties' attorneys' fees and expenses related to the *Petitions*.[42] Accordingly, at the close of the proof, the Court took this matter under advisement.

Based upon the above findings of fact, the Court finds it necessary to make specific determinations, which are essentially undisputed, based upon the Court's findings above and the testimonies provided by Mr. Manookian and Mr. Hammervold, to narrow the remaining issues.

### M.   Specific Findings of Fact on Material Matters Regarding Liability

87. Based upon the facts set forth in numbered paragraphs 11-15 herein, the Court finds on August 28, 2015, Mr. Manookian and Mr. Hammervold, as co-counsel, agreed on behalf of themselves and their clients they were bound by the *Agreed Protective Order* at the time it was signed, as opposed to when it was entered by the Court.

88. Based upon the facts set forth in numbered paragraph 17 herein, the Court finds on August 31, 2015, Mr. Manookian submitted a challenge to the Non-Parties' confidential designations and opposed entry of the *Agreed Protective Order;* however, Mr. Manookian struck his opposition on September 3, 2015 and requested specifically the Court enter the *Agreed Protective Order*, which the participants would follow in resolution of their dispute. However, as clearly shown on the face of the *Agreed Protective Order*, Mr. Manookian had already specifically agreed to be bound by it and the terms set forth therein.

---

[42] The Court shall address the findings of fact and conclusions of law as regards to damages below.

89. Based upon the facts set forth in numbered paragraph 69 herein, on September 1, 2015, Mr. Manookian knowingly, willfully, and intentionally disclosed certain documents of the Non-Parties' confidential discovery materials to General Funk. This disclosure of Non-Parties' confidential documents did not comply with the *Agreed Protective Order*.

90. Based upon the facts set forth in numbered paragraph 69 herein, in early October 2015, the Court finds Mr. Manookian knowingly, willfully, and intentionally disclosed documents of the Non-Parties' confidential discovery materials to David Raybin, Kim Hodde, and Eli Richardson, in violation of the procedures set forth in the *Agreed Protective Order*, each disclosure being an individual violation of the Court's Orders.

91. Based upon the facts set forth in numbered paragraphs 25-31 herein, on October 20, 2015 and October 30, 2015, the Court entered *Oral Orders* and subsequently written *Orders* on November 6, 2015 and November 7, 2015, respectively, mandating the Non-Parties' confidential discovery materials and deposition testimonies were to be kept confidential under the terms of the *Agreed Protective Order*. At both hearings, Mr. Manookian knowingly, willfully, and intentionally misled the Court in an attempt to cover up his wrongful acts by his failure to disclose his violations of the Court's *Order*.

92. Based upon the facts set forth in numbered paragraph 69 herein, Mr. Manookian knowingly, willfully, and intentionally violated the Court's *Orders* by providing the Non-Parties' confidential discovery materials and deposition testimonies to News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* and then continued to "cover up" his violations of the Court's *Orders* by perpetrating a

continuing and active fraud on the Court, the attorneys, and the parties to this lawsuit for many months.

93. Based upon the facts set forth in numbered paragraphs 48-50 herein, in February 2016, News Channel 4 WSMV, NewsChannel 5 WTVF, and the *Nashville Scene* took the Non-Parties' confidential discovery materials and deposition testimonies that Mr. Manookian unlawfully provided to these news entities, who then broadcasted separate news stories that disseminated such confidential materials and deposition testimonies to the general public throughout Middle Tennessee.

94. Based upon the facts set forth in numbered paragraphs 32-41 herein, starting in December 2016, Mr. Manookian and Mr. Hammervold knowingly, willfully, and intentionally employed the Non-Parties' confidential discovery materials in their representation of Mr. King in the matter of *King v. Chase* and other threatened criminal litigation in violation of the Court's *Orders.*

**N.   Critical Disputed Factual Issues**

The Court finds there are two critical factual disputes as to which the Court must resolve. First, the Court must determine whether Mr. Manookian gave the Non-Parties' confidential discovery materials and deposition testimonies to the news media between October 4, 2015 and October 6, 2015, as he claimed at the September 23, 2016 hearing and which would still be a violation of the *Agreed Protective Order* to which he signed and agreed to be bound by on August 28, 2015, or whether he gave such materials to the news media sometime after the Court ordered all of the Non-Parties' materials be kept confidential on October 20, 2015.

Second, the Court must determine whether Mr. Hammervold first found out about Mr. Manookian's disclosures to the news media a few days before the hearing of September 23, 2016, or whether he knew about and was complicit in such disclosures before that time, and has been an active participant in keeping such information from the Non-Parties and the Court throughout these proceedings.

For the Court to make such a factual finding related to the disputed facts, it first must determine the credibility of Mr. Manookian and Mr. Hammervold and measure the proper weight to give their respective testimonies.   Over the many months of this misrepresentation and fraud perpetrated upon the Court, this Court has had the opportunity to witness the demeanor of Mr. Manookian, who testified as a witness, and Mr. Hammervold, who testified as a witness.   It was important for this Court to carefully observe the demeanor of these witnesses since it appeared all of the proof was pointing to these two lawyers, as the two who wrongfully released protected documents to the media and others and then perpetrated an ongoing fraud against the Court for over two years, and it would be their opportunities to explain their actions.   The Court carefully observed the behavior and appearance of both Mr. Manookian and Mr. Hammervold. Courts have always acknowledged the significance of observing and hearing a witness prior to assessing his or her credibility.   For instance, the United States Court of Appeals for the Second Circuit has recognized that the carriage, behavior, bearing, manner and appearance of a witness—in short, his "demeanor"—is part of the evidence. The words used are by no means all that we rely on in making up our minds as judges about the truth of a question that arises in our ordinary affairs . . . . *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952); *see also, e.g., Ruggieri*, 291 A.2d at

445 (resolving the question of a witness' credibility would depend largely upon the observations of the witness' testifying at trial).

### (1)   Mr. Manookian's Credibility

The Court finds a credibility determination for Mr. Manookian is particularly important in this proceeding, because many of his positions and arguments are supported solely by his uncorroborated testimony. As such, the Court makes the following findings:

First, Mr. Manookian's *Declaration* of March 17, 2016 is a clear course of conduct to knowingly, willfully, and intentionally mislead the Court, the parties, and the attorneys. Although Mr. Manookian acknowledged the hearing of March 10, 2016, regarding the Non-Parties' *Motion for Sanctions,* "involve[d] the media's possession of discovery materials from this case," Mr. Manookian refused and failed to notify the Court in his *Declaration* under oath (emphasis added) of the fact that he was the individual who gave the confidential materials at issue to the news media. Mr. Manookian knowingly, willfully, and intentionally left out these crucial facts and did not mention the most important detail relating to this case, which was he was the actual person who released the confidential material to the news media. Instead, Mr. Manookian knowingly, willfully, and intentionally made the Court and the Non-Parties believe he was not the culprit of the leaked, confidential information through his knowing, willful, and intentional deception. There was no mystery that at the time he submitted his *Declaration* on March 17, 2016, Mr. Manookian knew he had violated the Court's *Orders*, and he was responsible for the disclosures to the news media; however, for weeks and months on end, Mr. Manookian purposefully chose to lie and perpetrate a continuing fraud on this

Court, the parties, and the attorneys in order to gain a personal advantage in his lawsuit, all to the detriment of everyone else.

Second, despite the procedure set forth in the *Agreed Protective Order*, to challenge certain designations of discovery material being marked as "confidential," on September 1, 2015, Mr. Manookian knowingly, willfully, and intentionally disclosed information the Non-Parties had designated "confidential" under the *Agreed Protective Order* in a letter to General Funk. (Tr. Exhibit 4, Sept. 23, 2016.) Mr. Manookian's letter claimed his improper disclosure was based upon, at least in part, "an interest of General Funk's safety," which this Court finds not credible. (*Id.*) Regardless of Mr. Manookian's "feelings" for General Funk, such a disclosure clearly violates the *Agreed Protective Order*, which provides any concerns about non-disclosure adversely affecting public safety should first be addressed with the Court. (*Motion for Entry of Agreed Limited Protective Order as to Certain Subpoenaed Parties* of August 28, 2015, Exhibit 1, section 12.1.) It should be noted, Mr. Manookian never raised these concerns laid out in his September 1, 2015 letter with the Court to disclose the Non-Parties' confidential materials to General Funk. Further, when General Funk did not respond to Mr. Manookian's "warning" letter of September 1, 2015, Mr. Manookian served General Funk with a deposition subpoena on September 9, 2015, which underscores the Court's finding that Mr. Manookian's interest in General Funk's "safety," was feigned as Mr. Manookian previously claimed.

Third, on February 3, 2016, Mr. Manookian and Mr. Hammervold filed *Plaintiff's Response to Defendant's Motion for Protective Order*, attaching as Exhibit 1 a copy of an unsigned Agreement of Partnership of NV Partners, which had been produced to Mr.

Manookian and Mr. Hammervold by the Non-Parties in this case and had been marked confidential pursuant to the *Agreed Protective Order* and the Court's *Orders*. (Tr. Exhibit 17, Sept. 23, 2016.) The Court finds such conduct shows Mr. Manookian's lack of credibility because he was willing to file a confidential document in violation of the *Agreed Protective Order* and this Court's *Orders*.

Fourth, Mr. Manookian and Mr. McGuire attended a meeting with Mr. Charles Malone together with other counsel of record regarding the *King v. Chase* case, at which they cited to documents by Bates-number supporting the threatened litigation against Dean Chase. (Hr'g Tr. 291:8-293:3, Sept. 23, 2016.) These documents were the very documents marked confidential pursuant to the *Agreed Protective Order* and the above *Orders* of this Court. (*Id.*) Thus, Mr. Manookian's failure to follow the terms of the *Agreed Protective Order* and the Court's *Orders* and attempting to use the confidential information provided in this case to support his other client's, Mr. King's case, shows Mr. Manookian's lack of credibility in this matter.

Fifth, as explained above, on January 21, 2016, Mr. Finley contacted General Funk to discuss a news story he planned to broadcast concerning this case. (Hr'g Tr. 222:11-229:7, Sept. 23, 2016; Tr. Exhibit 21, Sept. 23, 2016.) Mr. Finley submitted a series of emails to General Funk for the basis of his news story, which included (1) Mr. Manookian's October 19, 2015 *Response to Plaintiff's Expedited Motion for Sanctions, Protective Orders and Other Relief*; (2) the deposition transcript of Dean Chase and Sandra Chase of September 16, 2015; and (3) text messages produced by the Non-Parties in the original document discovery.[43] (Tr. Exhibit 21, Sept. 23, 2016.) Mr.

---

[43] The Court again notes these attachments were designated "confidential" by the *Agreed Protective Order* and the *Orders* entered by this Court.

Manookian admitted he in fact was the one that disclosed this information to Mr. Finley, which again was a violation of the *Agreed Protective Order* and the Court's *Orders*. This is further proof of Mr. Manookian's lack of credibility.

Sixth, on March 7, 2016, Mr. Manookian, together with the assistance of Mr. Hammervold, began a strategy to knowingly, willfully, and intentionally attempt to deceive and defraud this Court in order to avoid punishment for their actions. First, Mr. Manookian filed a *Motion to Strike and Response to Non-Parties' Motion for Sanctions*, asserting the Non-Parties' *Motion for Sanctions* was in reality a petition for contempt that should be stricken because the *Motion* does not even identify who the Non-Parties believe should be held in contempt. Also, Mr. Manookian argued the Court had "no authority" to sanction the offending individuals. It is apparent these actions were taken to prevent the Court from discovering the violators of the Court's *Orders* and the actual party that disseminated the confidential material to members of the public and the news media.

Seventh, on March 10, 2016, the Court held a hearing regarding the *Non-Parties' Motion for Sanctions*. However, Mr. Manookian failed to appear. (*See Non-Parties' Notice of Filing of Court Transcript* of April 26, 2017, Exhibit A, March 10, 2016, Hr'g Tr. 11:21-12:11; 29:23-24.) Mr. Hammervold did appear and made arguments on behalf of Mr. Manookian as well as himself. (*Id.* at 25:21-28:2; 51:18-54:18.) Mr. Hammervold argued Defendant, Clayton McKenzie, whom Mr. Hammervold and Mr. Manookian represented, was not bound by the *Agreed Protective Order;* the *Agreed Protective Order* allowed the Non-Parties' confidential materials to be used in related litigation, and the sanctions sought by the Non-Parties were inappropriate. (*Id.* at 25:21-28:2; 29:23-

24.)  Once again, this argument is contradictory to Mr. Manookian's prior email to Ms. Fenelon in which he clearly acknowledged the *Agreed Protective Order* was in effect and binding on him and his clients and stated, "I agree that the Order is binding on me and my clients at the time it is signed with permission as opposed to entered by the Court." (Tr. Exhibit 3, Sept. 23, 2016. Thus, for Mr. Manookian to allow Mr. Hammervold to represent him at the hearing and make such egregious arguments, while being fully aware he violated the *Agreed Protective Order* and the Court's *Orders* is indicative of Mr. Manookian's lack of credibility.

Eighth, on December 30, 2015, Mr. King sent an email to Mr. Palmer, another non-party to this present case, in which he discussed a potential lawsuit against Dean Chase and copied Mr. Manookian. The email Mr. King wrote on December 30, 2015, stated, in pertinent part:

> I believe David mentioned that I am vigilantly pursing a cause of action for breach of fiduciary duties on behalf of the law firm [Waller] and Dean [Chase] and attorney malpractice.
>
> **I was put in touch with an extremely competent and savvy attorney in Nashville who, through discovery, has ascertained all communications between the law firm [Waller], Dean [Chase] and David [Chase]** and has intimate knowledge of with [sic] what really took place behind the scenes.
>
> . . . .
>
> **You will be shocked to read the communications between Steven and Dean**, always putting Dean's personal interest first and never operating out of the best interest of the group.

(Tr. Exhibit 4, Nov. 9, 2017) (emphasis added).

The Court already found that this email was sent after the Court's *Order* of November 6, 2015 and, by a preponderance of the evidence, shows Mr. Manookian

disclosed this information to his client Mr. King. Thus, this again establishes Mr. Manookian's willingness to violate the *Agreed Protective Order* and Court's *Orders* for his own advantage and shows his lack of credibility.

Ninth, on August 31, 2015, Mr. Manookian submitted a challenge to the Non-Parties' confidential designations and opposed entry of the *Agreed Protective Order;* however, Mr. Manookian struck his opposition on September 3, 2015 and requested specifically the Court enter the *Agreed Protective Order*, which the participants would follow in resolution of their dispute. However, as clearly shown on the face of the *Agreed Protective Order*, Mr. Manookian had already specifically agreed to be bound by it and the terms set forth therein. Thus, Mr. Manookian attempting to unravel the *Agreed Protective Order* after he had already received the benefit of the bargain by receiving the confidential material shows his lack of credibility.

Tenth, on October 1, 2016, Mr. Manookian emailed counsel for the Non-Parties requesting authority to provide News Channel 4 WSMV with copies of Sandra Chase's deposition testimony, stating, "I will, **obviously**, follow your preference on this issue. I just need to know what that is." (*See* Tr. Exhibits 7 & 8, Sept. 23, 2016.) (emphasis added) Contrary to his representation he would respect the Non-Parties' "preference on this issue," Mr. Manookian once again knowingly, willfully, and intentionally violated the Court's *Orders* and disclosed the confidential deposition transcripts of both Dean Chase and Sandra Chase and the confidential documentation of text messages to Mr. Finley of News Channel 4 WSMV, Phil Williams of News Channel 5 WTVF, and Jim Ridley at the *Nashville Scene*. Each of these three disclosures represents individual, knowing, willful, and intentional violations of the Court's *Orders*, after Mr. Manookian was specifically told

the Non-Parties considered the depositions of both Dean Chase and Sandra Chase to be confidential. The Court finds Mr. Manookian's statement to counsel for the Non-Parties to be untrue. In other words, Mr. Manookian once again outright lied to counsel for the Non-Parties. This shows Mr. Manookian's lack of credibility.

Eleventh, on October 21, 2015, in an email to counsel for the Non-Parties and the Parties, Mr. Manookian, after asserting he had filed the exhibits to his October 19, 2015 filing under seal, represented that he:

> [T]ook precautions to ensure that [the exhibits containing the Non-Parties' confidential deposition testimonies and text messages] were provided only to the Court and attorneys for the parties to this action. You apparently received them nonetheless. To the extent these materials surface outside of the seal, it is important to know who has been disclosing them and to what additional non-parties they have been disclosed.

(Tr. Exhibit 10, Sept. 23, 2016.)

Remarkably, at the time Mr. Manookian sent this email, he had in fact already disclosed the subject confidential discovery materials and deposition testimonies to a number of individuals in violation of the *Agreed Protective Order*, which included General Funk, David Raybin, Kim Hodde, and Eli Richardson, and members of law enforcement. These disclosures to these individuals, plus law enforcement, if they in fact occurred, as stated by Mr. Manookian, are all just more examples of Mr. Manookian's defiant conduct as well as his knowing, willful, and intentional conduct to continue to perpetrate a fraud on the Court, the attorneys involved in the case, and the parties and his attempts to try and cover up his conduct by more misrepresentations, knowing, willful, and intentional false statements, and other deceitful conduct.   This shows Mr. Manookian's lack of credibility.

Twelfth, in response to an email on January 20, 2016, concerning the report of a leak to the news media and a potential violation of the Court's *Orders*, Mr. Manookian wrote, "did Mr. Finley indicate who the 'source' may be? I would note that [my client Defendant] Clayton McKenzie never agreed to keep any materials confidential; nor was he required to at any time prior to October 20, 2015."  (Tr. Exhibit 11, Sept. 23, 2016.) As later admitted by Mr. Manookian, this email was knowingly, willfully, and intentionally "misleading" when written because Mr. Manookian was well aware at that time **he** had given the materials to Mr. Finley.[44] The Court finds the statement when made by Mr. Manookian was known by him to be false and misleading, but was made knowingly, willfully, and intentionally to extend even longer Mr. Manookian's continuing ruse and fraud upon the Court, the attorneys involved, and the parties herein.

In addition, this Court finds it uncanny that any lawyer would knowingly, willfully, and intentionally implicate his own client of wrongdoing in order to defray the Court's attention from himself in order to, once again, continue to perpetrate his ongoing fraud against the Court, the attorneys involved, and the parties. This shows Mr. Manookian's lack of credibility.

Thirteenth, on April 21, 2016, Mr. Manookian filed a *Response* to the Non-Parties' *Petitions*, arguing the *Petitions* should be denied because they constituted "rank, unsupported hypothesizing," "speculation and shameless, Johnny-come-lately histrionics," and "assorted real and imagine conduct." (*Brian Manookian and Cummings Manookian PLC's Response to Non-Parties' Petition for Contempt and Motion for*

---

[44] The Court is astounded with Mr. Manookian's ability to not only implicate his own client in the violation of the *Agreed Protective Order*, but at the same time cover the tracks of his own wrongdoing, and his continuous deceptive conduct to accomplish such a feat in only one email exchange.  The time and effort utilized by Mr. Manookian to continue to perpetrate his fraud, deceptive conduct, and misrepresentations upon the Court is astonishing.

*Sanctions* of April 21, 2016, at p. 1-2; 8.) When Mr. Manookian filed these statements, he knew they were false and misleading because he had, in fact, already disclosed the Non-Parties' confidential discovery materials to the news media and others, and he was using the Non-Parties' materials in *King v. Chase* and other threatened criminal litigation to attempt to intimidate the attorneys. This also shows Mr. Manookian's willingness to continue on his path of deceiving this Court through his fraud and misrepresentations. This shows Mr. Manookian's lack of credibility.

Fourteenth, on September 16, 2016, Mr. Manookian, in yet another attempt to continue his ongoing fraud against the Court, the attorneys, and the litigants herein, filed a *Joint Motion to Dismiss* the *Petitions* [for contempt] prior to the September 23, 2016 evidentiary hearing at which he would have to testify, claiming to the Court the Non-Parties' *Petitions* constituted a "circus-like mass-inquisition" and "chas[ing] a wild goose," but also that it was "abundantly clear that [the Non-Parties] have no information to support their speculative allegations." (*Respondents Mark Hammervold, Hammervold PLC, Brian Manookian, and Cummings Manookian's Joint Motion to Dismiss Contempt Petition and Motion for Sanctions* of September 16, 2016, at p. 2-3.)   Mr. Manookian utilized very selective and convenient outrage to describe the actions of contempt set forth in the *Petition for Contempt*. Further, Mr. Manookian's use of theatrical histrionics to continue his fraud and deception are yet additional examples of his "litigation strategy" in this case, which was to lie, deceive, and then to "cover up".   However, despite Mr. Manookian's knowing, willful, and intentional warped and false portrayal of the facts in this case, and after being warned by the Court of his evasive, non-responsive, and deceitful responses, he would be forced to admit on cross-examination,

only hours after said *Joint Motion* was argued, that it was he who had disseminated the materials to the news media. This is yet another example of a false statement made by Mr. Manookian to continue his ongoing fraud, misrepresentation, and manipulation of the Court, the attorneys, and the litigants.  This shows Mr. Manookian's lack of credibility.  This shows Mr. Manookian's lack of credibility.

Fifteenth, on October 28, 2016, Chancellor Lyle entered a *Scheduling Order* in the *King v. Chase* case in the Chancery Court of Davidson County, Case No. 16-0030-II, in which she noted Mr. Manookian had stated in open court that "this lawsuit and the Williamson County lawsuits are not related." (Tr. Exhibit 1, Nov. 9, 2017.) However, Mr. Manookian's and Mr. Hammervold's representations to this Court have always been the filings in this case **are** related to *King v. Chase*. This leaves the Court with two logical conclusions; either Mr. Manookian and Mr. Hammervold were truthful with Chancellor Lyle, while at the same time they were deceiving and lying to this Court in order for their disclosure of confidential discovery materials to be permissible under the terms of the *Agreed Protective Order*, or Mr. Manookian and Mr. Hammervold were truthful with this Court but untruthful and lied to Chancellor Lyle in the *King v. Chase* case. Either way, Mr. Manookian and Mr. Hammervold have proven to have lied before at least two judges of this state to promote their own personal interests and to continue to perpetrate a fraud upon this Court, the lawyers, and the litigants.[45]  This shows Mr. Manookian's and Mr. Hammervold's lack of credibility.

[45] Throughout this *Memorandum and Order*, the Court has given several examples of Mr. Manookian's lying under oath regarding material matters in his ongoing fraud on this Court.  The Court makes no decision whether or not Mr. Manookian's perjury is misdemeanor perjury or felony aggravated perjury. This task will be left to the individuals and/or bodies in charge of making that determination.

Sixteenth, the Court noted, during Mr. Manookian's opportunity to finally tell the complete truth and stop the incessant, knowing, willful, and intentional lying on material issues, he still had an extremely difficult time being candid with the Court. In addition, the Court noted on numerous occasions, when Mr. Manookian made statements to this Court and to the attorneys, his tone of voice during arguments or while testifying as a witness, where his animosity and resentment of this Court and the attorneys was almost palpable. Throughout his sworn testimony on September 23, 2016, Mr. Manookian was warned repeatedly by this Court he was being evasive, vague, and ambiguous, and he was continuously failing to answer the questions being presented by Mr. Gayle Malone, counsel for the Non-Parties. The following are seven examples of this Court's attempts to warn Mr. Manookian of his evasive conduct in responding to questions under oath:

> **(1)  THE COURT:**          All right.  This is what I want to do:  Mr. Manookian, I know it's not comfortable testifying up here, and I understand that, and I'm not trying to be disrespectful to you, sir, as a lawyer.  But what I like to hear as a trier of fact is a question, and then if you would, if you can answer the question with yes, then feel free to explain; no, feel free to explain; I don't know.

Transcript of Hearing, Vol. I of II, September 23, 2016 at 111:17-23, *Chase v. Stewart, et al*, Williamson Circuit Court Case No. 2015-200.

> **(2)  THE COURT:**          All right.  Let's – let's – excuse me just a moment.  I'm sorry to interrupt.
> Let's try to be responsive to the question first, because I want to be clear.
> So let's ask the question again.
> If you'll answer the question first, sir, and then feel free to explain that answer any way you want to.

Hr'g Tr. at 128:12-18.

> **(3)  THE COURT:**          Let's do this:  I would really like to get an answer to the question.

MR. GAYLE MALONE:     Me too.

THE COURT:          I really would.    Because this is important.  I want to do the right thing.  And in order to do the right thing, I want to be crystal clear.

So, once again, I don't want to accuse you, sir, of being evasive. I'm not ready to do that at all.  What I'd like for you to do, to help me understand, is to answer the question first if you can then feel free to explain.

Would you do that for me?

MR. MANOOKIAN:          Absolutely.

THE COURT:          All right.

Hr'g Tr. at 137:15-138:1-2.

**(4)**  THE COURT:          But let's just try to answer the question and then explain so I can be crystal clear.

MR. MANOOKIAN:          And I've done that.  And Your Honor will probably notice —

THE COURT:          I don't think —

MR. MANOOKIAN:          -- that I haven't made hardly any objections to any of the questions --

THE COURT:          That's not what —

MR. MANOOKIAN:          -- because I want to get on the record precisely what occurred here with all the allegations have been made.

THE COURT:          I understand.  That's not what I'm talking about.  I simply want you to answer the question, if you can:  yes; no; I don't know.  And then, if you can, feel free to explain that.  I just want to be clear, instead of going off into orbit somewhere without answering the question.  Would you do that for me?

MR. MANOOKIAN:          Absolutely I will, Your Honor.

THE COURT:          Thank you.  All right.

MR. GAYLE MALONE:     I'll try again.

| THE COURT: | Okay.  Thank you. |
| MR. GAYLE MALONE: | I'll try to keep it simple. |
| THE COURT: | That's what I want to do. |

Hr'g Tr. at 138:8-139:1-5.

**(5)**   **THE COURT:**          Okay.  This is not difficult to me at all.  It is very simple.  The questions that are being asked are directed to you and your conduct.  I understand that you may be trying to provide a defense of some type, but that's not in response to the question.  I would appreciate it, if you would, in fact, answer the question.

**MR. MANOOKIAN:**     I believe I have.  I'm just —

**THE COURT:**     I don't believe you have.   I would appreciate if you would, once again, please answer the question so that I can understand what happened.

**MR. GAYLE MALONE:**   Do you want me to ask it again?

**THE COURT:**     Let's try it again.

**Q. (By Mr. Gayle Malone)** I'm trying to be simple.

Hr'g Tr. at 140:3-15.

**(6)**   **THE COURT:**          Stand by.
I really, one more time, sir, would like for you to answer the question first, if you could, and then explain.   That will really help me.  We're evolving into responses that are nonresponsive to the question that is very simple.  I know it's not pleasant.

**MR. MANOOKIAN:**     It's not unpleasant.

**THE COURT:**          May I — may I just finish.
I know it's not pleasant.  I know you don't like to be on the witness stand any more than anybody else.  But you've got to play by the rules like everyone else.
I would like for you to please answer the question first and then explain.  So let's be responsive.
Let's ask the question again, please.

Hr'g Tr. at 148:15-25; 149:1-2.