*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

| | |
|---|---|
| **MARK HAMMERVOLD** § | |
| §| |
| **Plaintiff** § | |
| § | **No. _____** |
| **v.** § | |
| § | |
| **DIAMONDS DIRECT USA OF** § | |
| **DALLAS,  LLC;** § | |
| § | |
| **DAVID BLANK; AND** § | |
| § | |
| **DIAMOND CONSORTIUM, LLC** § | |
| **d/b/a THE DIAMOND DOCTOR.** § | |

<u>**COMPLAINT**</u>

The Plaintiff, Mark Hammervold – in support of his causes of action against the Defendants – states as follows to the court and jury:

<u>**VENUE, JURISDICTION, AND PARTIES**</u>

1.      The Plaintiff, Mark Hammervold ("Hammervold"), is an attorney and an adult resident of Illinois.

2.      Defendant Diamonds Direct USA Dallas, LLC ("Diamonds Direct") is a Texas Limited Liability Corporation. Diamonds Direct may be served through its registered agent, Diamonds Direct USA of Austin, LLC at 11104 Domain Dr., Austin, TX 78758.

3.      Defendant David Blank ("Blank") is an adult resident of Texas. He may be found and served at 6338 Norway Rd., Dallas, TX 75230.

4.      Defendant Diamond Consortium, Inc. d/b/a The Diamond Doctor ("Diamond Doctor"), is a Texas Corporation. The Diamond Doctor may be served through its registered agent, David Blank, who may be found and served at 6338 Norway Rd., Dallas, TX 75230.

5.      The Diamond Doctor was a retail jewelry business located in Dallas, Texas. Diamond Doctor was owned and operated by David Blank.

*** ***Draft Complaint – Provided Subject to Fed. R. Evid. 408*** ***

6.      There is complete diversity among the Parties.

7.      The amount in controversy in this action exceeds $75,000.

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

## STATEMENT OF FACTS

9.      "European Gemological Laboratory," or "EGL," is a trademark and brand that can be licensed outside of the United Stated by entrepreneurs, without adopting industry-accepted standards for grading diamonds. As described by one diamond industry publication: "new EGLs pop up like mushrooms, some of which have outrageous standards or even no standards at all."[1]

10.     EGL International (EGL-I) was one of the most egregious abusers of the EGL trademark. EGL-I was a for-profit "EGL" licensee that operated out of Ramat Gan, Israel until late 2014. Before it was ultimately forced to close-down due to its fraudulent over-grading practices, EGL-I was widely-known in the diamond industry to issue bogus certificates grossly overstating the color and clarity of diamonds well beyond any honest margin of disagreement among gemologists.

11.     EGL-I's reputation for issuing bogus certificates egregiously overgrading diamonds had become so pronounced and well-known that by 2004, EGL-I was sued by other licensees of the "EGL" trademark for its "flagrant practices of unfair competition and inflated grading."[2] [3]

12.     Because EGL-I grades were known by industry professionals to be exaggerated and unreliable, reputable jewelers refused to accept or deal in diamonds accompanied by EGL-International certifications.

---

[1] Rapaport Magazine Special Feature, "Honest Grading," attached hereto as **Exhibit 1**.
[2] See **Exhibit 2** hereto.
[3] EGL USA is also a licensee of the EGL trademark and is also known to overstate the qualities of diamonds, but not as egregiously or as outrageously as EGL-I.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

13.     During the same period of time, certain unscrupulous jewelers, including Diamonds Direct and The Diamond Doctor, not only carried EGL-I certified diamonds, but made their sale central to their business models.  These jewelers would pass off inferior quality EGL-International diamonds to consumers as equivalent or comparable to GIA-certified by diamonds by using the industry-standard color and clarity grading terminology that EGL-I diamonds do not remotely meet.

14.     In doing so, retailers like Diamonds Direct and The Diamond Doctor could then claim to offer diamonds at "wholesale" or "direct importer" pricing when, in reality, they were simply selling an overgraded stone acquired at a steep discount to a comparable GIA diamond. This practice allowed those retailers to not only reap a profit margin that would not be possible selling legitimately-graded GIA diamonds, but also claim to have undercut their competitors' price.

15.     The Diamond Doctor held itself out as "a true Diamond Wholesaler." Diamond Doctor claims to "purchase stones directly from the best diamond mines in the world." Diamond Doctor maintains that "our diamonds are offered to our customers at a fraction of the price you would pay either online or at another diamond retailer."  Diamond Doctor further proclaims that "Diamond Doctor only sells GIA certified diamonds that are hand selected to maximize beauty and value."

16.     From at least 2013 to 2015, The Diamond Doctor sold a large volume of diamonds that had been overgraded and fraudulently certified by disreputable international diamond grading operating under the EGL trademark, including EGL-I.

17.     David Blank and The Diamond Doctor knew that EGL diamonds were consistently overgraded by 2-3 grades compared to the industry standard.[4]

18.     The Diamond Doctor was aware that selling EGL diamonds to consumers was misleading. In 2012, The Diamond Doctor's website claimed that The Diamond Doctor did not sell any EGL diamonds because "the EGL consistently gives higher grades for the same stones and would therefore make our sales price here at Diamond Doctor.com seem more attractive [than it is]."[5]

19.     When selling overgraded, fraudliently certified EGL-I Diamonds, The Diamond Doctor's employees and sales staff would falsely claim that the only difference between diamonds certified by the two laboratories is "the price."  By doing so, The Diamond Doctor was able to claim it offered diamonds at "wholesale" or "direct importer" pricing when, in reality, it was simply selling an overgraded stone that it acquired at a steep discount to a comparable GIA diamond.  This practice allowed Diamond Doctor to simultaneously reap a profit margin that would not be possible selling legitimately-graded GIA diamonds, while falsely claiming they have saved the customer money.

20.     Finally, at the time of a sale of a diamond, Diamond Doctor completed its sequence of fraud by bogusly appraising the diamond at or near the price of an equivalently graded GIA stone.   Diamond Doctor did so fully knowing that the inferior diamond was significantly overgraded; that it is not a GIA stone; and that it does not have the qualities necessary to support such a valuation.  Diamond Doctor issued these bogus appraisals to further dupe customers into accepting the fraudulent, inflated value for which Diamond Doctor sold the diamond.

---

[4] *See* **Exhibit 3**, Excerpt of the Deposition of Nicole Becker, p. 264:5-13.
[5] See **Exhibit 4**, The Diamond Doctor's Website as of June 23, 2012.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

### The EGL-I Scam is Exposed by Industry Insiders and Trial Lawyers

21.     By 2011, EGL-I's well-deserved reputation for fraudulent over-grading had become a major topic of discussion within the diamond industry.

22.     In June 2011, the annual Rapaport Conference hosted dedicated panels to address the growing industry concern about diamond overgrading.  At the 2011 conference, panelists feared the industry was "in a race to the bottom."[6]  One speaker put it succinctly. "We are cheating the consumer when you tell them the diamond is one or two-color grades better than it is.  If this was 18 karat gold and it was stamped 14 karat, everyone would be screaming bloody murder."

23.     Reporting on the 2011 certification conference, Rob Bates of JCK wrote "every day, people are sold diamonds 'upgraded' by two to three grades, because a respectable-looking piece of paper says it so... today, some labs have basically turned bribery into a business model."[7] Referring to EGL-International certificates, the article concluded "its reports are basically worth nothing."

24.     As the EGL scam became subject to increasing scrutiny within the diamond industry, various industry publications began discussing the significant legal and business risks facing those who had trafficked in EGL diamonds. On June 11, 2013, JCK reported that one "oft-mentioned-solution" to the EGL scam "is a class action lawsuit." "Simply sue the worst offenders out of business, and the rest of the trade will pay attention."[8]

25.     In July 2014, Brian Manookian began filing the first of a series of diamond overgrading lawsuits against Genesis Diamonds in Nashville. When that happened, David Blank

---

[6] JCK Las Vegas: Industry Debates Grading Lab Standard, JCK, June 7, 2011.  Attached as **Exhibit 5**.
[7] The Problem With Diamond Certs, JCK, June 8, 2011.  Attached as **Exhibit 6**.
[8] The Diamond Lab System is Broken. How Do We Fix It? Attached as **Exhibit 7**.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

was forwarded a link to media coverage of that lawsuit from an industry friend, who proclaimed: "This is the beginning of the end of EGL as we know it. Prepare yourself."[9]

26.     On September 9, 2014, the world's largest diamond exchange, RapNet, announced that it was de-listing all EGL-I diamonds and banning their trade among wholesalers and retailers on its exchange.  The basis for the decision was EGL-I's practice of fraudulently misrepresenting the qualities and characteristics of the diamonds it graded.

27.     Explaining the decision, Martin Rapaport, chairman of the Rapaport Group, stated, "The Rapaport Group is opposed to the misrepresentation of diamond quality.  The over-grading of diamonds is an unfair practice that destroys consumer confidence and the legitimacy of the diamond industry. Retailers who sell over-graded diamonds using GIA terminology and non-GIA grading standards are at great risk. When consumers try to resell their diamonds or send them to the GIA for regrading and discover significant quality differences, there will be hell to pay."

28.     On September 17, 2014, Polygon, the world's largest online community and trading network of certified jewelers, followed suit – banning the trade of EGL-International diamonds on its site.  A statement by Polygon's senior director acknowledged that, "the industry does not support the trade of these stones based on EGL International grading reports."

29.     In November 2014, diamond industry publications began sounding the alarms of the existential legal exposure faced by unscrupulous retailers who had sold high volumes of overgraded EGL diamonds:

> What will happen when consumers find out about the massive overgrading situation? Will consumers say, "Oh, I knew that EGLI was using a different lower grading standard and I paid a fair price, so no problem?" Or will EGLIs become the new Yehuda fracture-filled diamonds of the twenty-first century? Will consumers who have been sold diamonds without fair disclosure line up waiting for appraisers to tell them the GIA quality of their diamonds? Will the eager beaver, class action lawyers smell opportunity? Will consumers and

---

[9] Attached hereto as **Exhibit 8**.

attorneys general demand refunds? If so, who will pay? <u>We are not just talking about theoretical abstract reputational risk. No, we are talking about cold, hard cash.</u> Something tangible that everyone in our trade understands. While I don't want to create panic, <u>I do want to warn everyone about the serious risk we are facing.</u> Well over a billion dollars of overgraded diamonds are out there and some of them will come back to retailers from consumers demanding a full retail refund. If retailers take back the diamonds and provide a full refund, things may not get too messy. However, if retailers do not take back the diamonds, they will be offered for resale on the open market and/or sent to the GIA for regrading. <u>Consumers will find out that they have been taken for a ride. If a critical mass of consumers is made aware of the overgrading of their diamonds and they are unable to get their money back, things may get frighteningly interesting.</u> We can expect a publicly driven social media blast against diamonds, the likes of which we have never seen or can barely imagine. …

While there does not appear to be any imminent threat of consumers returning these diamonds en masse, <u>a few lawsuits have already commenced.</u> Failure by jewelers and the diamond trade to provide fair refunds to consumers seeking to return overgraded diamonds could encourage other consumers to question the quality of their diamonds. <u>Should consumers find that a significant number of diamonds have been overgraded, a run of refund requests to jewelers is possible. If this occurs, it is unlikely that retailers will have the necessary funds to provide refunds. In any case, there would be significant damage to overall consumer confidence for all diamonds.</u>[10]

30.     On December 3, 2014, having been exposed as a systemically fraudulent organization, EGL-I announced it was shutting down.

31.     Even after EGL-I had been shuttered by the diamond industry and banned by several of the largest diamond markets, The Diamond Doctor continued selling overgraded diamonds fraudulently certified by EGL-I.

***Cummings Manookian's Solicitation of Verified Consumer Protection Claims Against Diamond Doctor for Unfair, Deceptive and Fraudulent Sales of Over-Graded EGL Diamonds***

32.     Cummings Manookian maintains a general website that solicits consumers who have been victims of EGL-I diamond fraud at diamondlawsuit.com. Upon information and belief,

---

[10] Rapaport Special Report, "Honest Grading," November 2014. Attached as Exhibit 1 (emphasis added).

through that site, Cummings Manookian began receiving information that The Diamond Doctor had long been flooding the Dallas market with over-graded EGL-I diamonds.

33.     Upon information and belief, Cummings Manookian undertook an extensive investigation to confirm the wrongdoing. Upon information and belief, after interviewing industry sources, ex-employees, and scores of customers, Cummings Manookian learned that The Diamond Doctor had been, and continued to be, one of the worst offenders in the EGL-I certificate scam. Upon information and belief, Cummings Manookian further confirmed this fact when it secured *thousands* of the very EGL-I certificates Mr. Blank used to rip off his customers.

34.     In October 2015, upon information and belief, Cummings Manookian began advertising directly to Mr. Blank's victims through a dedicated website, and simultaneously making media purchases, including through Google and Facebook, to get the message out to the widest possible audience of Diamond Doctor customers. Upon information and belief, the Cummings Manookian website dedicated to potential claims against Diamond Doctor went live on October 22, 2015.

35.     Upon information and belief, Cummings Manookian's dedicated Diamond Doctor website provided entirely truthful information about diamond grading, EGL-I, and diamond over-grading and served as a resource for consumers to learn whether they have verifiable diamond over-grading claims against The Diamond Doctor.

### Blank and Diamond Doctor Respond by Intimidating and Attacking Cummings Manookian

36.     Upon information and belief, shortly after Cummings Manookian began alerting the public about the fraud perpetrated by The Diamond Doctor, Blank and The Diamond Doctor began taking every available bad-faith measure to intimidate, attack, and/or con Cummings

Manookian out of pursuing potential claims on behalf of consumers against him and his fraudulent business.

37.     Upon information and belief, on the very day that Cummings Manookian's dedicated Diamond Doctor site went live, October 22, 2015, Diamond Doctor and its first set of attorneys began using all manner of threats and abuses of the legal process to prevent Cummings Manookian from soliciting clients for diamond overgrading claims against The Diamond Doctor.

38.     Upon information and belief, on October 26, 2015, then-counsel for The Diamond Doctor sent a cease and desist letter to Brian Manookian, alleging the kitchen sink: violation of The Diamond Doctor's trademark(s), defamation, misrepresentation, and violations of Tennessee State Bar Rules. Upon information and belief, The Diamond Doctor also sent the letter to the Tennessee Board of Professional Responsibility and the Texas State Bar.

39.     On October 30, 2015, The Diamond Doctor sued Brian Manookian in Texas State Court, petitioning for an injunction requiring him to take down the website. The same day, the court *sua sponte* denied the petition and ordered Diamond Doctor's lawyers to appear and show cause for why they should not be disciplined under Tex. Discpl. Rule 4.04(b)(1).[11] The Diamond Doctor thereafter dismissed its own case.

40.     Upon information and belief, after realizing that legal process could not be legitimately used to shut-down Cummings Manookian's client solicitation campaign, The Diamond Doctor and Mr. Blank came up with a scheme to buy and seal off Cummings Manookian by "retaining" them.

41.     On November 6, 2015, Blank approached Manookian about The Diamond Doctor "retaining" Cummings Manookian for a monthly retainer. Upon information and belief, Blank did

---

[11] Tex. Discpl. Rule 4.04(b)(1) provides: "a lawyer shall not present, participate in presenting or threaten to present: … disciplinary charges solely to gain an advantage in a civil matter.

not actually have interest in Manookian representing him as counsel – it was only sham to "conflict" Manookian out of soliciting or representing clients adverse to The Diamond Doctor.

42.     Based on information and belief, Manookian entertained, but ultimately declined Blank's offer. Based on information and belief, Manookian and Blank terminated discussions of Manookian representing Blank sometime in November 2015 and did not re-open such discussions anytime thereafter.

43.     Upon information and belief, after Manookian declined Blank's offer, Blank began labeling Manookian an "extortionist," and repeatedly threatened that unless Cummings Manookian agreed to remove its Diamond Doctor website, Blank would seek to have Mr. Manookian criminally prosecuted and professionally sanctioned by the Board. Upon information and belief, Diamond Doctor additionally claimed that simply by propositioning Cummings Manookian to represent him, Diamond Doctor had succeeded in conflicting them out of all future cases.

44.     Upon information and belief, on December 11, 2015, David Blank sent another bar complaint to the Tennessee Board of Professional responsibility against Manookian that abandoned the prior line to attack (soliciting clients for "bogus" claims) and instead claimed that Blank's failed request to retain Cummings Manookian was an "extortion scheme" by Cummings Manookian. Upon information and belief, the letter further claimed that Cummings Manookian was not even a legitimate law practice, but rather a sophisticated, mafia-like, criminal enterprise.

45.     Upon information and belief, Blank admitted in his December 11, 2015 letter that his *express goal* in complaining to the Board, was that "the Cummings Manookian 'law practice' will be shuttered…"

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

46.     Upon information and belief, at the time Blank made these claims to the Board –

for the express purpose of "shuttering" the law practice of Cummings Manookian – he knew his

accusations were false, including because he knew that it was *his* idea and proposal to retain

Cummings Manookian.

### Mark Hammervold Starts Hammervold PLC and Files Overgrading Claims Against Mervis

47.     Mark Hammervold became a licensed attorney in 2012. From 2012 to July 2015,

Hammervold worked as an associate attorney at the health care litigation law firm, Gideon, Cooper

& Essary, PLC, in Nashville, TN.

48.     In August 2015, Mark Hammervold formed his solo law practice, Hammervold

PLC.

49.     One of Mark Hammervold's first cases was joining Cummings Manookian as co-

counsel in a diamond overgrading case against a local jeweler in Lebanon, Tennessee (*Burgess v.

The Jewelers, et al.*).

50.     In late December 2015 / early January 2016, Brian Manookian referred two

diamond overgrading cases against Mervis Diamond to Hammervold. In January 2016,

Hammervold, along with local Maryland counsel, filed *Ramsey v. Mervis*, No. 414008-V and

*McMullen v. Mervis,* No. 414009-V.

51.     The gravamen of these claims was that Mervis had materially misrepresented the

color and clarity grades of diamonds Mervis had sold to the plaintiffs, and that at the time of those

sales, Mervis presented fraudulent EGL-I diamond grading certificates that it knew overstated the

grades of those diamonds.

52.     Plaintiff Ramsey alleged that Mervis had represented the diamond to be "F" color

and "SI1" clarity, but the diamond was actually "H" color and "I1" clarity. This allegation was

supported by an independent pre-suit evaluation performed by the GIA. During the Ramsey

lawsuit, Mervis' retained an expert gemologist *agreed* with Ramsey's allegations that the diamond

was H/I1 – not F/SI1 as had been represented by Mervis at the point of sale. Mervis himself also

agreed with his retained expert's conclusion that Ramsey's diamond was H/I1 – not F/SI1.

53.     In the McMullen case, the IGI and GIA both agreed that the diamond had been

overgraded and Mervis ultimately accepted responsibility for selling McMullen an overgraded

diamond:

| | |
|---|---|
| Mr. Hammervold: | Do you accept responsibility for selling Ms. McMullen a diamond that was overgraded? |
| Mr. Mervis: | We accept responsibility, yes. |

54.     Discovery in the Mervis cases conclusively demonstrated that Mervis was aware –

prior to selling the diamonds at issue in that litigation – that the EGL-I certificates it had supplied

both plaintiffs were known to overstate the color and clarity grades of diamonds.

55.     The most clear-cut evidence of Mervis' awareness of this issue came from internal

emails produced by Mervis in discovery:

**Ronnie Mervis**

| | |
|---|---|
| **From:** | Ronnie Mervis |
| **Sent:** | Thursday, January 2, 2014 6:49 PM |
| **To:** | Brie Robbins |
| **Subject:** | Re: Thursday |

I guess our diamond is a Gia. You should knock egl grading. It's at least one color and clarity off.

Ronnie Mervis
Mervis Diamond Importers

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

56.     A slew of internal Mervis emails demonstrated that EGL-I's overgrading of diamond was common knowledge at Mervis and among its sales team, including the following examples:

- On July 24, 2012, Zed Mervis emailed Mervis employee Tina Cleary about 3 diamonds certified by the GIA as being "I" color. Zed Mervis comments to Ms. Cleary that "any of these can get F at EGL."

- In an email sent on June 14, 2013, Zed Mervis tells Mervis employee Nancy Choi "if it's a nice diamond, nobody will both to get an EGL certificate."

57.     Mervis' legal defenses were as flimsy as their factual defenses. At the outset of the case, Mervis moved to dismiss the complaint based on arguments that it was not responsible for the grading reflected in the EGL-I diamond certificates, and that diamond grading is entirely subjective, and so it cannot be misrepresented. The plaintiffs' response demonstrated these arguments had been rejected by every court known to address these issues and were also inconsistent with diamond industry norms and even Mervis' own representations.[12] The court agreed with the plaintiffs and denied Mervis' motion to dismiss.[13]

58.     The Mervis lawsuits were clearly meritorious and represented a significant threat to other jewelers who had sold a large volume of overgraded EGL diamonds, including Diamonds Direct and The Diamond Doctor.

### Other Jewelers' Awareness of and Response to Hammervold's Mervis Lawsuits

59.     In response to the Mervis lawsuits, another diamond retailer who had sold a large volume of EGL diamonds – International Diamond Center ("IDC") – ordered a memo to be prepared by Sara Brady, a public relations firm.[14] The memo identified a need for IDC to "Have a Crisis Response Plan in place should another lawsuit be filed against IDC with similar allegations."

---

[12] **Exhibit 9**.
[13] **Exhibit 10**.
[14] Attached hereto as **Exhibit 11**.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

The memo also suggested IDC and other jewelers who sold large volumes of EGL diamonds adopt a "bold" "proactive" collective "plan of action" to "invalidate Manookian and his cohorts," including demand letters, countersuits, media campaigns, and bar complaints. This memo used the term "cohorts" to include Hammervold.

60.     On January 22, 2016, this memo was forwarded to Blank in an email with the subject line "Plan of Attack." The email stated: "Collectively we need to work together on this issue."[15] On January 25, 2016, Diamond Doctor COO Nicole Becker responded to an email forwarding her the "Plan of Attack" email, commenting as follows: "This is exactly what we were talking about Friday. Let's fight!!!!!!!!!!!!!! Get them all together and let's get that united front. We also need to set forth plan B."[16]

61.     On January 25, 2016, Mr. Blank emailed Ronnie Mervis regarding the plan of attack. He relayed: "I am instructing my lawyers to sue the guy in Federal court and <u>have him start spending money</u>. I would very much like for you and others to join me, he is not going away!!!! They believe they can severly [sic] limit the discovery. <u>It would also help your local case</u>."[17] The "local case" to which Blank was referring was the consumer lawsuit Hammervold had filed against Mervis three weeks earlier. Blank expressly communicated his belief that suing Manookian/Hammervold in federal court would help collaterally defend the consumer overgrading cases Hammervold was prosecuting in Maryland state court.

62.     Diamonds Direct was also apprised of this "plan of attack" and agreed and conspired to help Diamond Doctor execute a concerted plan of attack against Hammervold and

---

[15]*See* Exhibit 11.
[16] Attached as **Exhibit 12**.
[17] Attached as **Exhibit 13** (emphasis added).

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

others willing to represent consumers pursue diamond overgrading claims against those who had sold large volumes of overgraded EGL-I diamonds.

### *Diamond Doctor's Bogus "Extortion" Claim and Lawsuit Against Manookian*

63.     On February 3, 2016, The Diamond Doctor filed a federal RICO lawsuit against Manookian, alleging that Manookian had <u>extorted</u> him by demanding $3 million dollars to stop a "smear campaign."

64.     The original lawsuit alleged that "Manookian told Blank that he would take down the website and cease attacks on Facebook if The Diamond Doctor 'engaged' Cummings Manookian as its outside legal counsel" and "Manookian proposed that The Diamond Doctor pay Cummings Manookian $25,000 a month over a 10-year period for an aggregate fee of $3,000,000." The Complaint misleadingly excerpted portions of conversations between Blank and Manookian to make it appear as though Manookian had demanded Blank retain Cummings Manookian.

65.     The Diamond Doctor's lawsuit claiming "extortion" by the Manookian Defendants was an entirely contrived effort to intimidate and to achieve a hush agreement with the Manookian Defendants requiring the Manookian Defendants to be silent about Diamond Doctor's deceptive trade practices after Diamond Doctor failed to effectively achieve this by retaining and "conflicting out" Cummings Manookian.

66.     Based on information and belief, Blank and The Diamond Doctor engaged in settlement discussions with Cummings Manookian after filing the lawsuit, wherein Blank and The Diamond Doctor offered to make a large payment to Cummings Manookian for a "global" release. Blank and The Diamond Doctor's lawsuit and settlement offers were a continued attempt to achieve the same objective as their prior attempts to "retain" Cummings Manookian in November 2015.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

67.     In Blank and Diamond Doctor's original complaint, they did not name Hammervold as defendants, nor did they identify Hammervold as playing any role in the so-called "extortion scheme."

### Hammervold Represents Claimants Against Diamond Doctor, Becomes a Target

68.     In mid-March 2016, Hammervold sent Texas Deceptive Trade Practices Act ("DTPA") notices[18] on behalf of four consumers who had retained Hammervold to pursue DTPA claims against Blank and The Diamond Doctor.

69.     On March 21, 2016 – after receiving those notices – Blank and Diamond Doctor amended their complaint. This amended complaint noted: "[s]ince the commencement of this litigation, on March 8, 14, 16, and 18, 2016, Hammervold has sent The Diamond Doctor four demand letters pursuant to the Texas Deceptive Trade Practices Act," and also, "Hammervold is the lead attorney in two pending consumer suits against a Manookian victim in Washington, D.C." Based on these facts alone, Plaintiffs began referring to Hammervold a "co-conspirator" to the so-called "extortion scheme."

70.     By June 2016, nine (9) clients had retained Hammervold to pursue diamond overgrading claims against Blank and The Diamond Doctor.

71.     On June 2, 2016, then-Counsel for Diamond Doctor, Don Godwin, communicated to Hammervold that Blank and Diamond Doctor were willing to settle all of Hammervold's clients' DTPA claims, but *only if* Hammervold and his then local counsel, Bill Dipple, agreed to never represent any other claimants against Diamond Doctor:

- "I believe that the only way Mark, my client would be willing to try to reach a resolution with you is to know that there would be no more cases you would present."
- "How can he have assurance that you wouldn't be coming up with additional claimants? That's what I'm trying to accomplish."

---

[18] Such notices *must* be sent prior to a DTPA lawsuit per Tex. Bus. & Comm. Code § 17.505.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

- "Let me couch it this way, my client would like to have closure with you and your clients, if and when a settlement is reached. And we want to know, can we have closure so that other claims won't be brought by you?"
- "And so what I recommend you do is speak to Bill about it. And you know, just say, 'Don mentioned to me if we can reach a resolution they'd like to have closure. They don't want to see the Bill and Mark show come running through town again and they want to do that and not just settle the seven cases, but they want closure on it and can that be done?'"
- "I've heard of other lawyers that are representing David Blank and Diamond Doctors say to me, 'Well sure it can be done.' And I've said, 'Tell me how?' Well to this date nobody has told me how." [19]

72.     After Hammervold refused to voluntarily agree to a "global" pre-suit settlement of his clients claims, which imposed an unethical restriction on Hammervold's ability to represent other claimants, Blank, The Diamond Doctor, its lawyers, and its insurance company, Jeweler's Mutual, continued to look for another way to achieve this unlawful end.

73.     On September 14, 2016, Defendants added Hammervold as a defendant to the federal lawsuit. The allegations against Hammervold were sparse and generic. The Defendants' complaint against Hammervold only sought monetary damages.

74.     Blank and Diamond Doctor's complaint did not seek – *and could not have lawfully sought* – to enjoin Hammervold from soliciting and/or accepting representation of clients pursuing claims against Blank, The Diamond Doctor and/or Diamonds Direct.

75.     On August 11, 2016, Hammervold, in association with local Texas counsel, filed the first of a series of consumer lawsuits against Diamond Doctor in Texas state court, alleging violation of the DTPA, fraud, and breach of warranty ("consumer claims").

76.     Diamond Doctor and/or Diamonds Direct made a claim to Jewelers Mutual in connection with the consumer claims. Jewelers Mutual assigned those claims internal claim number "45-002624," and the internal title: "Diamonds Direct." Based on information and belief,

---

[19] Full transcript attached hereto as **Exhibit 14**.

Diamonds Direct assumed control and/or indirectly controlled the manner in which the consumer claims were litigated.

77.     In 2016, Hammervold maintained a limited $100,000 liability insurance that diminished dollar for dollar with defense costs. After Defendants learned of same, they intentionally conducted the litigation against Hammervold in a way that diminished his policy. On at least one occasion, attorney Bruce Steckler – an agent for the Defendants – openly joked that Hammervold's insurance policy was being "chomped, chomped, chomped" away. This was consistent with David Blank's comments earlier in 2016 that the case was filed to get Manookian to start paying money.

<u>**Involvement of Diamonds Direct**</u>

78.     Diamonds Direct is a diamond retail chain based in Charlotte, North Carolina. Upon information and belief, in November 2015, Diamonds Direct was purchased by Blackstone Group, and it thereafter began aggressively expanding by acquiring other diamond retailers.

79.     Based on information and belief, Diamonds Direct – like the Diamond Doctor – had sold a large volume of EGL-I diamonds based on the inflated grades of EGL-I certificates it knew overgraded the diamonds. Diamond Direct did so without disclosing to its customers that the diamonds were overgraded by 2-3 grades or more.

80.     Sometime between November 2015 and October 2016, Diamonds Direct began negotiating with Blank to acquire The Diamond Doctor and a deal was consummated in October and/or November 2016. Upon information and belief, The Diamond Doctor and Diamonds Direct discussed the lawsuit against Manookian and Hammervold, as well as the anticipated consumer claims that Hammervold was pursuing against The Diamond Doctor.

81.     Diamonds Direct knew that Blank and Diamond Doctor's claims against Manookian, and by extension, Hammervold, were meritless, including because Diamonds Direct had legitimately retained Manookian to represent them on an ongoing basis.

82.     In November 2016, Diamonds Direct began operating a new Dallas location of Diamonds Direct at 8127 Preston, Rd., Dallas, TX 75225. Amit Berger, a senior Vice President of Diamonds Direct, moved to Dallas to oversee the operations of the store. Blank continued to work with Amit Berger at the Dallas location of Diamonds Direct.

83.     Based on information and belief, Diamonds Direct acquired the Diamond Doctor's customer transaction information, and expressly and/or constructively assumed the warranties Diamond Doctor had made to consumers regarding those transactions.

84.     Based on information and belief, at the time of the acquisition of The Diamond Doctor, and thereafter, Diamonds Direct, including Amit Berger, remained informed, and were actively involved in, The Diamond Doctor's lawsuit in federal court against Manookian and Hammervold, as well as the consumer claims Hammervold was pursuing against The Diamond Doctor in Texas state court.

**Defendants' Abuses of Process**

85.     The Defendants conspired to abuse process in the federal case and in the consumer cases to attempt to achieve unlawful objectives, including by improper use of discovery to embarrass, discredit and invalidate Hammervold, to provide false inculpatory testimony against Manookian, and to obtain Hammervold's agreement that he would not solicit or pursue any claims against Blank, Diamond  Doctor and/or Diamonds Direct.

86.     In September 2016, Blank and The Diamond Doctor issued discovery requests to Hammervold's clients in the nine consumer cases Hammervold had filed with local counsel. Some

*** Draft Complaint – Provided Subject to Fed. R. Evid. 408 ***

of those requests had absolutely no bearing on the case issues and no other purpose, other than to

embarrass, discredit and invalidate Hammervold (and Manookian, who had referred many of the

clients to Hammervold).

87.     Specifically, Blank and The Diamond Doctor issued requests for admission to

Hammervold's clients, asking Hammervold's clients to admit each of the following:

a.  Admit that you knew that attorney Mark Hammervold was recently suspected
    (by a Circuit Court in Tennessee) of violating the Tennessee Rules of Civil
    Procedure and various Orders that had previously been entered by that Court in
    Tennessee before you threatened to file any affirmative claims for relief against
    the Plaintiff and/or David Blank.

b.  Admit that you were aware of the fact that attorney Mark Hammervold admitted
    (to the Court in Tennessee discussed above) to the use of confidential
    information provided by non-parties in one lawsuit that, in the opinion of that
    Tennessee Court, was an "apparent violation" of the
    Tennessee Court's August 28, 2015 "Agreed Order" before you threatened to
    file any affirmative claims for relief against the Plaintiff and/or David Blank.

c.  Admit that you knew that the Tennessee Court referenced above specifically
    instructed the parties and non-parties in the case that was pending before it that
    they were "directed" to file Motions for Sanctions and/or Petitions for Civil
    and/or Criminal Contempt against Mark Hammervold and his law firm if they
    were intending to do so before you threatened to file any affirmative claims for
    relief against the Plaintiff and/or David Blank.

d.  Admit that Cummings Manookian, PLC introduced you to attorney Mark
    Hammervold.

e.  Admit that you knew that Brian Manookian spoke with David Blank of the
    Plaintiff about the possibility of entering into an attorney-client relationship
    before Cummings Manookian, PLC referred you to attorney Mark
    Hammervold.

f.  Admit that you are aware of the fact that Cummings Manookian, PLC has both
    solicited individuals like you to pursue claims against jewelers like the Plaintiff
    and agreed to defend jewelers in claims that are asserted against them that are
    similar to the claims that you have threatened to assert against the Plaintiff.

g.  Admit that you were aware of the fact that Brian Manookian was arrested and
    charged with driving under the influence before you threatened to file any
    affirmative claims for relief against the Plaintiff and/or David Blank.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

h. Admit that you were aware of the fact that Brian Manookian's business partner (or former business partner) in the gun armory had specifically alleged that Brian Manookian had forged the name of his business partner to a check without authorization after specifically being instructed not to do so, before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

i. Admit that you knew that Brian Manookian's business partner (or former business partner) in the gun armory had specifically accused Manookian of absconding with an AR-15 assault rifle and that same effectively placed the gun armory's Federal Firearms License at risk, before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

j. Admit that you knew that Brian Manookian's business partner (or former business partner) in the gun armory specifically alleged that Manookian attempted to purchase a Glock pistol unlawfully before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

k. Admit that you knew that Brian Manookian had been accused of reckless driving and, according to Manookian's business partner (or former business partner) in the gun armory, had pled guilty to reckless driving before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

l. Admit that you knew that Brian Manookian's business partner (or former business partner) in the gun armory had specifically alleged that Manookian stated – or suggested – that it was his plan to wait until his partner (or former partner) in the gun armory business died and then "steal" that partner's membership interest away from that partner's children before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

m. Admit that you knew that Brian Manookian's business partner (or former business partner) in the gun armory specifically alleged that Manookian had made certain statements to him that made him "reasonably fearful for his personal safety" before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

n. Admit that you were aware of the fact that the Plaintiff filed suit against Brian Manookian, Cumming Manookian, PLC, and others in federal court in Texas alleging that the Defendants in that case (including Brian Manookian) had selectively targeted and systematically attacked prominent, successful retail customers in a number of states – including the Diamond Doctor in Texas – intending to harass and intimidate these jewelers into believing that their businesses are in jeopardy by threatening mass amounts of *alleged* diamond

"over-grading" claims before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

o.   Admit that you knew that Cummings Manookian, PLC had been found by one or more arbitration panels to have registered certain disputed domain names for commercial gain and in bad faith before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

p.   Admit that you knew that attorney Brian Manookian was recently suspected (by a Circuit Court in Tennessee) of violating the Tennessee Rules of Civil Procedure and various Orders that had been previously entered by that Court in Tennessee before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

q.   Admit that you knew that Brian Manookian had been arrested for driving with a suspended license before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

r.   Admit that you knew that Brian Manookian had been arrested for domestic assault before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank

s.   Admit that you knew that Brian Manookian was charged (by federal prosecutors) with violating the FTCA by distributing a product in interstate commerce when that product had not been approved by the FDA, that Manookian faced up to one (1) year in prison, and that Manookian ultimately pled guilty to this charge before you threatened to file any affirmative claims for relief against the Plaintiff and/or David Blank.

88.   After the Defendants issued this discovery, Hammervold's local counsel, Bill Dippel, withdrew from the representation. As a result, Hammervold and Hammervold's nine clients had to find a substitute local Texas counsel.

89.   On May 24, 2017 – on the eve of the date that the Defendants had scheduled for the deposition of Mark Hammervold – Counsel for Blank and The Diamond Doctor, Randy Johnston, spoke with Mark Hammervold, and his attorney Varant Yegparian on the phone. During the phone call, Mr. Johnston stated that his job in the case was to "ensure that Mr. Manookian was disbarred." In the next sentence, Mr. Johnston stated that if Hammervold remained a defendant in the case, he would face "career-altering, life-lasting consequences." Hammervold understood this threat from

Mr. Johnston to imply that that if Hammervold did not go along with the Defendants' demands, Defendants would make it their goal to use the proceedings to try to get Hammervold disbarred.

90.     Mr. Johnston communicated to Hammervold that he should seriously consider settlement, and that Blank and Diamond Doctor would be willing to dismiss their case against Hammervold, withdraw their objections to Hammervold appearing *pro hac vice* in the consumer claims (where Hammervold was opposing counsel), and settle those cases. But the extent to which Blank and Diamond Doctor would be willing to do those things depended directly upon Hammervold's willingness to provide testimony adverse against Manookian in that case and to agree not to accept any more diamond cases (against Diamond Doctor and Diamonds Direct).

91.     Hammervold understood Mr. Johnston's demand that Hammervold provide testimony "adverse against Brian Manookian" in that case to mean false testimony, because Blank/Diamond Doctor and their attorneys already had the right to elicit any relevant, non-privileged truthful testimony from Hammervold during his next-day deposition (without a settlement).

92.     On June 27, 2017 the Blank and Diamond Doctor's claims against Hammervold were severed from the Defendants' claims against Manookian and the other co-Defendants.

93.     On the eve of trial (August 16, 2017), Blank and Diamond Doctor reached a "global" settlement with Manookian. Based on information and belief, Amit Berger and Diamonds Direct were informed of and provided input in the negotiations of settlement between Manookian and Blank and Diamond Doctor.

94.     Shortly after the settlement was finalized, Blank and Diamond Doctor's attorneys made several statements to the media, characterizing the settlement as a "complete vindicate[ion]" and "major win" for Blank and Diamond Doctor. Attorney Randy Johnston – on behalf of Blank

and Diamond Doctor "said under the deal, the Blank family did not have to pay any money to Tennessee lawyer Brian Manookian or his law firm Cummins [sic] Manookian."[20] However, an attorney for Blank and Diamond Doctor, Howard Klatsky, later admitted that the settlement between Blank / Diamond Doctor and Manookian provided for a circuitous payment to Manookian that was structured as one of Blank and Diamond Doctor's  attorney's purchasing internet sites from Manookian:

| | |
|---|---|
| Judge Clement: | What's the status of your case against Mr. Manookian? |
| Howard Klatsky: | Your Honor, there was a compromise, a confidential settlement agreement entered into that resulted in the entry of a, an agreed permanent injunction. So the claims against Mr. Manookian and his firm have been resolved. |
| Judge Clement: | So, does the confidentiality prevent you from saying whether money was paid? |
| Howard Klatsky: | Um, whether money was paid? As part of the settlement? Your Honor, I believe that it does. If you were to order me to answer your question, I would, would certainly, uh, do so. |
| Judge Clement: | Okay. <u>Was the money paid?</u> |
| Howard Klatsky: | As I understand things ... I'm not trying to be cute. The answer is yes and no. <u>Technically no</u>, under the terms of the agreement. <u>However, my recollection of things</u>, and I was one of a handful of lawyers involved, <u>is that one of the law firms who was representing my client agreed to purchase certain internet sites that Mr. Manookian had allegedly posted.</u> |
| Judge Clement: | Like the Facebook ads and all that? |
| Howard Klatsky: | Yes, Your Honor. <u>And that was the way it was ultimately resolved</u>, to the best of my understanding.[21] [22] |

---

[20] Diamond Doctor case ends with both sides agreeing to halt war of words. 8/21/17. **Exhibit 15**.

[21] This is an unofficial transcript of an audio excerpt from the Fifth Circuit's official audio recording of the oral argument that took place before the Fifth Circuit on February 7, 2018.

[22] After Mr. Klatsky publicly made this admission during recorded argument before the Fifth Circuit, Blank and Diamond Doctor asked the Fifth Circuit to "seal" that portion of the transcript. That request was meritless and denied.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

95.     Based on information and belief, during the negotiation of settlement between Blank / Diamond Doctor and Manookian, the attorneys for Blank / Diamond Doctor requested that Manookian agree and/or facilitate Hammervold releasing all claims against Blank and Diamond Doctor and agreeing to the terms of an Agreed Permanent Injunction.

96.     In connection with the settlement Blank / Diamond Doctor and Manookian submitted an "Agreed Permanent Injunction," which "enjoined from any harassing conduct or disparaging or defaming the services, business, integrity, veracity or personal or professional reputations of [a party by] the other in either a personal or professional manner at any time and through any medium or intermediary."

97.     By its terms, this Agreed Permanent Injunction not only applied to the Parties who agreed to its entry, but also "those persons in active concert or participation with [the Parties] who receive actual notice of this order by personal service or otherwise."

98.     The Agreed Permanent Injunction was

99.     On January 31, 2018, Counsel for Blank / Diamond Doctor sent a written settlement communication to Hammervold, demanding – as the primary consideration for dismissal of the suit – that Hammervold agree ***not to solicit any claims*** against Blank, Diamond Doctor or Diamonds Direct:

> That Mark Hammervold and Hammervold, P.L.C. agree that they will not actively solicit any individual who has not previously retained Hammervold, P.L.C. to pursue affirmative claims for relief against The Diamond Consortium, Inc. and Diamond Consortium, LLC, and/or David Blank to retain Mark Hammervold, Hammervold, P.L.C., or any other attorney or law firm to assert/pursue claims relating to the alleged overgrading and sale of diamonds first shown or sold (whichever date occurred first) to customers on or before November 1, 2016 against, or to file suit against, David Blank, his spouse, his children, his parents, The Diamond Consortium, Inc., Diamond Consortium, LLC, any other privately-held entity that David Blank has a direct or indirect ownership interest in, any employees or former employees of The Diamonds Consortium, Inc., Diamond Consortium, LLC, or Diamonds Direct in the future;[23]

---

[23] Settlement Communication of January 31, 2018. **Exhibit 16**.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

100.    At the time this demand was communicated, the attorneys representing Blank and Diamond Doctor knew that it was wrongful.

101.    Rule 5.06 of most states' ethical rules applicable to lawyers provides that "A lawyer shall not participate in offering or making … an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a suit or controversy."

102.    On April 27, 2016, Hammervold filed a motion requesting guidance from the court as to whether he could agree to restrict his practice in connection with a settlement that might be reached during the court-ordered mediation that was scheduled to occur on May 12, 2017 and May 15, 2017.

103.    On May 9, 2017, Blank and Diamond Doctor responded by accusing Hammervold of asking the court to "essentially bless a violation of an ethical rule." This response further characterized Hammervold's request for guidance on the issue as "shock[ing] the conscience and surpass[ing] reason."

### Count I – Abuse of Process

104.    The Defendants had an ulterior motive when using and abusing process in *Diamond Consortium v. Manookian, et al.* and *Diamond Consortium v. Hammervold, et al.* Specifically, the Defendants conspired to abuse process in these cases, as part of a broader "plan of attack" to collaterally defend and/or to seal-off Manookian and Hammervold from soliciting or pursuing meritorious diamond overgrading grading claims against Blank, Diamond Consortium, and Diamonds Direct, and/or to embarrass, intimidate, invalidate, and/or discredit Hammervold.

105.    The only form of relief sought by Defendants in the Complaint against Hammervold was monetary damages. The law would not support a request by Defendants for an injunction precluding Hammervold from soliciting or representing claimants against Defendants.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

Yet, in their settlement demands – from June 2016 to January 2018 – Defendants insisted on an agreement from Hammervold that would effectively seal Hammervold off from representing consumers pursue diamond overgrading claims against the Defendants.[24]

106.     Defendants abused process, including in the following ways:

    a.   Demanding that Hammervold agree to solicit for and/or accept any other diamond cases against Defendants;

    b.   Pursued Diamond Consortium v. Hammervold in a way aimed to drain Hammervold's insurance policy and financial resources, so he would have no other option but to agree to the illegal terms Defendants sought from him;

    c.   Obtaining an agreed injunction that arguably applied as against Hammervold – as a party they alleged was in "active concert" with Manookian, when Hammervold would not agree to same;

    d.   Issuing discovery requests in the consumer cases that had no legitimate purpose and were designed only to embarrass, discredit and/or invalidate Hammervold in the eyes of his clients and his local counsel; and

    e.   Obtaining an Agreed Permanent Injunction that arguably applied to Hammervold; and

    f.   Obtaining an Agreed Permanent Injunction to silence Brian Manookian, a critical witness for Hammervold's defense against Blank and the Diamond Consortium's bogus claims against Hammervold.

107.     Diamonds Direct conspired with Blank and Diamond Doctor to abuse process against Hammervold in the federal case and in the state law consumer cases, in order to coerce

---

[24] Defendants' often demanded monetary payment as well, but it was typically nominal.

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

Hammervold into entering into an illegal settlement agreement, in which Hammervold agreed to never solicit or pursue claims against The Diamond Doctor, Blank and Diamonds Direct, or alternatively, to intimidate, embarrass, discredit and/or invalidate  Hammervold if Hammervold was unwilling to agree to same.

108.    As a direct and proximate result of Defendants' abuses of process, Hammervold was damaged in excess of $500,000.

109.    Since Defendants intended to damage the Plaintiff and/or were reckless as to whether their abuses of process would damage the Plaintiff, the Plaintiff is entitled to an award of at least 1,500,000 in punitive damages.

## Count II – Defamation *Per Se*

110.    In  early 2018, Bruce Stecker, acting as an agent for the Defendants, and in furtherance of Defendants conspiracy to pressure Hammervold to agree to never solicit or to pursue consumer claims against Blank, Diamond Doctor or Diamonds Direct, made a series of false and disparaging statements to Peter Lubin about Mark Hammervold. Stecker made a series of statements to Mr. Lubin to the effect that Hammervold was part of an illegal extortion ring.

111.    Due to Mr. Steckler's statements, Mr. Lubin filed motions for sanctions against Hammervold and bar complaints against Hammervold in both Tennessee Board of Professional Responsibility and the Illinois ADRC.

112.    When Hammervold defended himself against these false charges, Mr. Lubin told the Illinois ARDC "You can contact attorney Bruce Steckler to find out the evidentiary basis for his clients' claims that Hammervold is part of the alleged criminal extortion conspiracy."

*** *Draft Complaint – Provided Subject to Fed. R. Evid. 408* ***

113.    Defendants' statements as alleged herein are false and defamatory *per se* as they relate to Mark Hammervold and impute the commission of criminal acts and want of integrity in his profession as an attorney.

114.    Defendants published defamatory statements to third parties without privilege and outside the confines of the federal lawsuit between Diamond Consortium and Hammervold.

115.    As a proximate result of Defendants' defamatory statements, Mark Hammervold has suffered and will continue to suffer harm to his  reputation in the community and other presumed and general damages in amount in excess of $500,000.

116.    Defendants knew or should have known that its agent, Bruce Steckler's statements were false when he made them, or he acted with reckless disregard for whether the statements were true or false.

117.    Defendants acted with malice and in a willful and wanton manner. Accordingly, Plaintiff is entitled to an award of at least 1,500,000 in punitive damages.

## DEMAND FOR JURY TRIAL

118.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff requests a trial by jury.

WHEREFORE, the Plaintiff, Mark Hammervold, requests that this Court enter judgment in their favor and against Defendants David Blank, The Diamond Consortium, Inc. and Diamonds Direct USA of Dallas as follows:

(A) Award Plaintiff actual damages in excess of $1,000,000;

(B) Award Plaintiff punitive damages in an amount in excess of $3,000,000;

(C) Award costs;

(D) Any further relief this Court deems just.