**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| THE DIAMOND CONSORTIUM, INC. | § | |
| D/B/A THE DIAMOND DOCTOR | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Action No. 4:17-CV-00452 |
| | § | |
| MARK HAMMERVOLD and | § | |
| HAMMERVOLD PLC. | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS MARK HAMMERVOLD AND HAMMERVOLD PLC'S MOTION FOR
ATTORNEYS FEES AND COSTS PURSUANT TO 28 U.S.C. § 1927 AND COMMON
LAW "BAD FAITH" EXCEPTION TO THE AMERICAN RULE**

---

The Defendants, Mark Hammervold and Hammervold PLC ("Hammervold" or "Defendants"), respectfully request that this Court award Hammervold his reasonable attorneys' fees and costs incurred in this action against Plaintiffs and Plaintiffs' Counsel, jointly and severally, as sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent authority under the common law "bad faith" exception to the American Rule.

This Court should require the Plaintiffs and Plaintiffs' Counsel to pay the Defendants' reasonable attorneys' fees and costs because the Plaintiffs and Plaintiffs' Counsel have used this Court and this lawsuit as a continued means to negotiate an illicit deal to effectively pay-off Manookian to not solicit or represent claimants against the Plaintiffs. The Plaintiffs and Plaintiffs' Counsel added Hammervold as a Defendant to this action without basis, and in bad faith, after

Hammervold refused to be part of a "global" settlement that would also seal-off Hammervold, by expressly preventing him from soliciting or representing any future claimants against Plaintiffs.

Alternatively, this Court should set an evidentiary hearing to determine the Plaintiffs basis and reasons for pursuing claims against Hammervold to determine whether this Motion should be granted.[1]

## MOTION STANDARD

Even after a lawsuit has been voluntarily dismissed, the district court retains jurisdiction to award sanctions, including attorneys' fees, against a plaintiff that filed and/or prosecution an action in bad faith. *See e.g., Macheska v. Thomson Learning*, 347 F. Supp. 2d 169, 179 (M.D. Pa 2004).

28 U.S.C. § 1927 authorizes federal courts to award attorneys' fees and expenses against any attorney who unreasonably and vexatiousness multiplies a proceeding. This requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 527-28 (5th Cir. 2002). "To shift the entire cost of defense, the claimant must prove, by clear and convincing evidence, that every facet of the litigation was patently meritless, and counsel must have lacked a reason to file the suit and must wrongfully have persisted in its prosecution through discovery, pre-trial motions, and trial." *Id.*

Federal courts also possess inherent authority to assess attorney's fees and litigation costs against a plaintiff who has acted in bad faith, vexatiously, wantonly or for oppressive reasons. *Batson v. Neal Spelce Associates, Inc.*, 805 F.2d 546, 550 (5th Cir. 1986). When a defendant makes a request for fees against an unsuccessful plaintiff, the bad faith, vexation, wantonness, or oppression often relates to filing and maintaining the action, but courts may also award fees "as a

---

[1] **Exhibit 1** to this motion is a list of all Exhibits attached hereto.

sanction for bad faith in the conduct of the litigation resulting in an abuse of judicial process." *Batson*, 805 F.2d at 550.

This so-called "bad faith exception to the American rule" is tantamount to 28 U.S.C. § 1927, but permits a court to award fees and costs against parties and/or counsel. *Hillman Lumber Prods. v. Webster Mfg.*, 727 F. Supp. 2d 503, 509 (W.D. La. 2010) ("The only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent powers is, as noted above, that awards under § 1927 can be made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.").

The standards for awarding attorneys' fees due to a plaintiff's bad faith in bringing and prosecuting a lawsuit "are necessarily stringent." *Batson*, 805 F.2d at 550. The bad faith exception "punishes abuse of the litigation process" and requires a showing that a claim was brought "brought in bad faith or for oppressive reasons…" *Flanagan v. Havertys Furniture Cos.*, 484 F. Supp. 2d 580, 582 (W.D. Tex. 2006). Attorneys' fees will not be awarded where "after discovery… [a] litigant[] realize[s] the evidence to support one or more of their claims is lacking and move[s] to dismiss those claims." *Id.* "Such conduct should be encouraged rather than punished." *Id.* A party should not be penalized "for maintaining an aggressive litigation posture," but "advocacy simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly warrants recompense for the extra outlays attributable thereto." *Batson*, 805 F.2d at 550 (*quoting Lipsig v. National Student Marketing Corp.,* 214 U.S. App. D.C. 1, 663 F.2d 178, 181 (D.C. Cir. 1980)).

Attorneys' fees may be assessed against a plaintiff when the court finds that the plaintiff filed and prosecuted factually baseless claims against a defendant for an illicit purpose collateral

to the relief sought in the lawsuit. *Blakeman v. Philip R. Bishop & Bishop, Payne, Harvard & Kaitcer, LLP (In re W. Fid. Mktg.),* 2001 Bankr. LEXIS 2244, * (Bankr. N.D. Tex. May 31, 2001).

<u>**FACTUAL BACKGROUND**</u>

The Plaintiffs, David Blank and Diamond Consortium, were the owners and operators of a retail diamond and jewelry business specializing in the sale of loose diamonds, diamond engagement rings and other jewelry in the Dallas area.

**a. Diamond Grading and the Industry-Standard GIA Color and Clarity Scales.**

Diamonds are graded and evaluated on four scales routinely referred to as "the Four C's." The Four C's measure a diamond's color, clarity, carat weight, and cut. Diamond "color" is often described on a scale of D-Z and diamond clarity is often described on a scale from flawless (FL) to I3 (Included):





A diamond's color and clarity grades materially affect the value of the diamond. A reduction in even one color or clarity grade can significantly reduce the value of a diamond. As a result, diamonds over one carat sold in the United States are routinely accompanied by a certification/grading report evaluating the Four C's of the diamond offered for sale.

In 2012, Plaintiffs claimed on their website to "use GIA exclusively, because it is the Gold Standard in the diamond industry."[2] The Plaintiffs explained: "The GIA is the creator of the famous 4C's of diamond value (color, clarity, cut and carat weight) and the birthplace of the International Diamond Grading System, now used as the industry standard" and "Because the GIA Certificate defines the gem with such scientific precision, appraisals from recognized jewelers and gemologists will be remarkably similar and reflect current market forces."[3]

**b. The EGL-I Scam and Plaintiffs' Exposure due to Selling Thousands of EGL Diamonds they Knew were Overgraded by 2-3+ Color/Clarity Grades.**

"European Gemological Laboratory," or "EGL," is a trademark and brand that can be licensed outside of the United Stated by entrepreneurs, without adopting industry-accepted standards for grading diamonds. As described by one diamond industry publication: "new EGLs pop up like mushrooms, some of which have outrageous standards or even no standards at all."[4]

EGL International ("EGL-I") was one of the most egregious abusers of the EGL trademark. EGL-I was a for-profit "EGL" licensee that operated out of Ramat Gan, Israel until late 2014. Before it was ultimately forced to close-down due to negative publicity and industry responses to its over-grading practices, EGL-I was widely-known in the diamond industry, including to Plaintiffs, to issue certificates that grossly overstated the color and clarity grades of diamonds by 2-3 grades or more.

By 2011, EGL-I's reputation for over-grading had become a major topic of discussion within the diamond industry. In June 2011, the annual Rapaport Conference hosted dedicated panels to address the growing industry concern about diamond overgrading. At the 2011

---

[2] Copy of Plaintiffs' website, produced by Plaintiffs, attached hereto as **Exhibit 2**.
[3] See Exhibit 2.
[4] Rapaport Magazine Special Feature, "Honest Grading," attached hereto as **Exhibit 3**.

conference, panelists feared the industry was "in a race to the bottom."[5] One speaker put it succinctly: "We are cheating the consumer when you tell them the diamond is one or two-color grades better than it is.  If this was 18 karat gold and it was stamped 14 karat, everyone would be screaming bloody murder."[6] Reporting on the 2011 certification conference, Rob Bates of JCK wrote "every day, people are sold diamonds 'upgraded' by two to three grades, because a respectable-looking piece of paper says it so... today, some labs have basically turned bribery into a business model."[7]  Referring to EGL-International certificates, the article concluded "its reports are basically worth nothing."[8]

As the EGL scam became subject to increasing scrutiny within the diamond industry, various industry publications began discussing the significant legal and business risks facing those who had trafficked in EGL diamonds. On June 11, 2013, JCK reported that one "oft-mentioned-solution" to the EGL scam "is a class action lawsuit." [9] "Simply sue the worst offenders out of business, and the rest of the trade will pay attention."[10]

In July 2014, Brian Manookian began filing diamond overgrading lawsuits against Genesis Diamonds in Nashville. David Blank heard about these lawsuits by July 28, 2014, when he was forwarded a link to media coverage of the lawsuits from a friend who warned him: "This is the beginning of the end of EGL as we know it. Prepare yourself."[11]

On September 9, 2014, the world's largest diamond exchange, RapNet, announced that it was de-listing all EGL-I diamonds and banning their trade among wholesalers and retailers on its

---

[5] JCK Las Vegas: Industry Debates Grading Lab Standards, JCK, June 7, 2011. Attached as **Exhibit 4**.
[6] Exhibit 4.
[7] The Problem With Diamond Certs, JCK, June 8, 2011. Attached as **Exhibit 5**.
[8] Exhibit 5.
[9] The Diamond Lab System is Broken. How Do We Fix It? Attached as **Exhibit 6**.
[10] Exhibit 6.
[11] July 28, 2014 email produced by Plaintiffs, attached hereto as **Exhibit 7**.

exchange.[12]  The basis for the decision was EGL-I's practice of fraudulently misrepresenting the

qualities and characteristics of the diamonds it graded.  Explaining the decision, Martin Rapaport,

chairman of the Rapaport Group, stated as follows:

> The Rapaport Group is opposed to the misrepresentation of diamond quality.  The over-grading of diamonds is an unfair practice that destroys consumer confidence and the legitimacy of the diamond industry. <u>Retailers who sell over-graded diamonds using GIA terminology and non-GIA grading standards are at great risk. When consumers try to resell their diamonds or send them to the GIA for regrading and discover significant quality differences, there will be hell to pay.</u>[13]

On September 17, 2014, Polygon – the world's largest online community and trading

network of certified jewelers – followed suit, banning the trade of EGL-International diamonds on

its site. A statement by Polygon's senior director acknowledged that, "the industry does not support

the trade of these stones based on EGL International grading reports."[14]

In November 2014, diamond industry publications began sounding the alarms of the

existential legal exposure faced by retailers who had sold a large volume of EGL diamonds:

> What will happen when consumers find out about the massive overgrading situation?…Will the eager beaver, class action lawyers smell opportunity?…While I don't want to create panic, I do want to warn everyone about the serious risk we are facing. … If a critical mass of consumers is made aware of the overgrading of their diamonds and they are unable to get their money back, things may get frighteningly interesting. … If you are a retailer trading in overgraded diamonds, you had best be prepared to buy them back or go out of business. ... You should also consider that even if you agree to buy back the diamonds from consumers, an enterprising lawyer might still claim that you defrauded clients by not providing full disclosure of quality and subject you to a lawsuit demanding triple damages.[15]

On December 3, 2014, EGL-I announced it was shutting down.[16]

---

[12] RapNet to Stop Listing EGL Grading Reports, September 9, 2014. Attached hereto as **Exhibit 8**.
[13] Exhibit 8 (emphasis added).
[14] Polygon De-Listing All EGL International Lab Reports, September 17, 2014. Attached hereto as **Exhibit 9**.
[15] Exhibit 3, p. 4.
[16] JCK: EGL Int'l Shutting Down as Network Reorganizes, December 3, 2014. Attached hereto as **Exhibit 10**.

From 2010 to 2015, the Plaintiffs sold thousands of diamonds that had been graded and certified by EGL. During the same period of time, the Plaintiffs knew that EGL diamonds were consistently overgraded by 2-3 grades compared to the industry standard.[17]

Even after EGL-I had been banned by the major diamond markets and had shut down, the Plaintiffs continued selling EGL certified diamonds, including to eventual Hammervold client Nick Fung on December 4, 2014,[18] and to eventual Hammervold client Chris Parker on February 7, 2015.[19]

### c. **Cummings Manookian's Launch of a Diamond Doctor Client Solicitation Campaign**.

In April 2015, Cummings Manookian launched a website – diamondlawsuit.com – that provided information about diamond overgrading and EGL-I, and solicited clients who had unwittingly purchased an overgraded EGL-I diamond to pursue consumer actions.

On October 22, 2015, Cummings Manookian launched www.diamonddoctorlawsuit.com. This website was a virtual copy of Cummings Manookian's general EGL-I / diamond overgrading diamond website, but specifically solicited to represent customers who had unwittingly purchased an overgraded EGL diamond from Diamond Doctor.

Hammervold did not establish www.diamonddoctorlawsuit.com or any other similar website regarding Plaintiffs, including www.diamonddoctorfraud.com or www.diamonddoctorclassaction.com.[20]

---

[17] *See* Exhibit 2; excerpt of the Deposition of Nicole Becker, p. 264:5-13, attached as **Exhibit 11**.
[18] Nick Fung Receipt and EGL-I Certificate attached as **Exhibit 12**.
[19] Chris Parker Receipt and EGL-I Certificate attached as **Exhibit 13**.
[20] Plaintiffs' Responses to Hammervold's Requests for Admissions, #80, attached hereto as **Exhibit 14**.

### d. The Plaintiffs Multi-Faceted Bad Faith Efforts to Intimidate, Silence, and/or Buy-Off Cummings Manookian.

On October 26, 2015, then-counsel for Plaintiffs sent a cease-and-desist letter to Cummings Manookian claiming defamation, trademark infringement, and violations of Tennessee bar rules, and demanding Cummings Manookian take down www.diamonddoctorlawsuit.com.[21] The Plaintiffs sent a copy of the letter to the Tennessee and Texas bars.

On October 30, 2015, the Plaintiffs then sued Brian Manookian in Texas state court, petitioning for a temporary and permanent injunction requiring Manookian to take down www.diamonddoctorlawsuit.com.[22] The same day, the court *sua sponte* denied the petition for a temporary injunction on the basis that it would be an unconstitutional prior restraint and required Plaintiffs to present a copy of the order to any other judicial officer from whom they might seek similar injunctive relief.[23] The order further ordered Plaintiffs' then-counsel to appear and show cause for why they should not be disciplined under Tex. Discpl. Rule 4.04(b)(1).[24][25] The Plaintiffs thereafter dismissed their suit on November 3, 2015.[26]

After Plaintiffs' efforts to silence Cummings Manookian through the state court litigation were unsuccessful, Mr. Blank pivoted to a different strategy to silence Manookian by "retaining" him. According to Mr. Blank, he communicated to his lawyers, Charles Kaplan and Braden Wayne: "there must be some way that we can get [Manookian] to defend us against future potential

---

[21] Letter attached hereto as **Exhibit 15**.
[22] Complaint attached as **Exhibit 16**.
[23] Order attached as **Exhibit 17**.
[24] Exhibit 17.
[25] Tex. Discpl. Rule 4.04(b)(1) provides: "a lawyer shall not present, participate in presenting or threaten to present: … disciplinary charges solely to gain an advantage in a civil matter.
[26] Nonsuit attached as **Exhibit 18**.

claims or something like that."[27] Against his lawyers' advice, Mr. Blank decided to reach out to Manookian directly to propose "retaining" Manookian.[28]

On November 6, 2015, Plaintiffs' then-lawyer left Manookian the following voicemail at 8:43 AM:

| | |
|---|---|
| Charles Kaplan: | Brian, it's Charles Kaplan if you want to give me a call. If not, I'm going to have my client... My client wants to chat with you, and you have my permission, to talk with him, but you might want to give me a call.[29] |

At 12:02 PM and 12:04 PM, Mr. Blank left Manookian the following voicemails on his office line and cell phone lines:

| | |
|---|---|
| David Blank: | Mr. Manookian, hi, my name is David Blank. If you have a moment today, like Charles said, I want to talk to you. If you have a moment to indulge me, I would appreciate it if you could call me back. This is my cell number 214-335-8363, although I am still going to call you at your office. Thank you.[30] |
| David Blank: | Hi, Mr. Manookian. This is David Blank speaking. I just left a message on your cell phone. If you would please indulge me and give me a call back on 214-325-8363, I'll get back to talk to you about something. Thank you very much. Bye-bye.[31] |

Manookian called Mr. Blank at 12:07 PM. Mr. Manookian recorded that initial call and produced both the original recording and a transcript, which started with the following sequence:

| | |
|---|---|
| David Blank: | Hello? |
| Brian Manookian: | Mr. Blank, this is Brian Manookian. |
| David Blank: | Good morning Brian, thank you for calling me back. |
| Brian Manookian: | Sure. |

---

[27] Transcript of initial call between Blank and Manookian, attached as **Exhibit 19**, at p. 3:7-12.
[28] Exhibit 19, 3:21-4:9.
[29] Attached as **Exhibit 20**.
[30] Voicemail from David Blank to Brian Manookian, November 6, 2015.  Attached as **Exhibit 21**.
[31] Voicemail from David Blank to Brian Manookian, November 6, 2015.  Attached as **Exhibit 22**.

| David Blank: | Candidly, I wish I had personally called you the moment I saw this matter and I didn't, but I am calling you now. |
| Brian Manookian: | I'm happy to speak with you. |
| David Blank: | Okay. Well, I am a reasonable man, from what I understand, you are a somewhat reasonable man, too. I wanted to talk to you about settling the alleged matter somehow moving forward and somehow if at all possible, retaining you to represent me in future matters.[32] |

Mr. Blank proceeded to propose the Plaintiffs "retaining" Manookian for a period of eight (8) years for a payment of $2.5 million dollars.[33]

According to the Plaintiffs' allegations in this lawsuit, Blank's overture to "retain" Manookian was a *sham* way for Blank to pay-off Manookian to stop Manookian's client solicitation campaign against the Plaintiffs. Dkt. 5, ¶¶ 46-48. Plaintiffs had learned that other jewelers, including Solomon, had neutralized Manookian's efforts to solicit clients for diamond overgrading claims by "retaining" him. Dkt. 5, ¶ 47.

Manookian was initially resistant – or at least initially conveyed resistance[34] – to the buy-off / "retention" deal proposed by Blank, but then ultimately engaged Blank in 4-6 conversations in November 2015 regarding terms of a potential "retainer" agreement.[35] According to the Plaintiffs, the conversations regarding the "extortion" agreement ended in November 2015.[36]

e. **Mark Hammervold and Hammervold PLC's Acceptance of Representation of Diamond Cases Referred from Cummings Manookian.**

Mark Hammervold became a licensed attorney in 2012. From 2012 to July 2015, Hammervold worked as an associate attorney at the health care litigation defense firm, Gideon,

---

[32] Exhibit 19 (emphasis added).
[33] Exhibit 19, 5:6-12.
[34] *See* Exhibit 19.
[35] Plaintiffs' Responses to Manookian's interrogatories, #2, attached as **Exhibit 23**.
[36] Plaintiffs' Responses to Manookian's interrogatories, #2, attached as Exhibit 23.

Cooper & Essary, PLC, in Nashville, TN. In August 2015, Mark Hammervold formed his solo law practice, Hammervold PLC.

On September 14, 2015, Hammervold joined Cummings Manookian as co-counsel in a jewelry fraud case Cummings Manookian had previously filed against a jeweler in Wilson County, Tennessee.[37] By November 25, 2015, Hammervold had obtained judgment in favor of the client on one of the plaintiff's theories of liability.[38]

In late December 2015 / early January 2016, Manookian referred two diamond overgrading cases against Mervis Diamond to Hammervold. In January 2016, Hammervold, along with local Maryland counsel, filed *Ramsey v. Mervis*, No. 414008-V[39] and *McMullen v. Mervis,* No. 414009-V.[40] The gravamen of these claims was that Mervis had materially misrepresented the color and clarity grades of diamonds Mervis had sold to the plaintiffs, and that at the time of those sales, Mervis presented EGL-I diamond grading certificates that it knew overstated the grades of those diamonds.[41] Plaintiff Ramsey alleged that Mervis had represented the diamond to be "F" color and "SI1" clarity, but the diamond was actually "H" color and "I1" clarity.[42] This allegation was supported by an independent pre-suit evaluation performed by the GIA.[43] Ramsey had also been encouraged by a friend who contacted an independent jeweler on his behalf to obtain counsel and pursue a claim for fraud against Mervis.[44] During the Ramsey lawsuit, Mervis' retained expert gemologist issued a report *agreeing* with Ramsey's allegations that the diamond was H/I1 – not F/SI1 as had been represented by Mervis at the point of sale.[45]

---

[37] Complaint and Notice of Appearance attached as **Exhibit 24**.
[38] Order attached as **Exhibit 25**.
[39] Attached as **Exhibit 26**.
[40] Attached as **Exhibit 27**.
[41] *See* Exhibits 26 and 27.
[42] Exhibit 26 at p. 10-11, ¶¶ 27, 31.
[43] Attached as **Exhibit 28**.
[44] Attached as **Exhibit 29**.
[45] Attached as **Exhibit 30**.

Before the *McMullen* case was filed, Mervis had sent the diamond to both the GIA and the IGI to be evaluated. Both labs agreed that the diamond was "H" color and "I2" clarity – a combined five (5) grades worse than Mervis had represented at the point of sale (E/SI2).[46] Confronted with the consensus of the GIA and IGI's findings, Mervis admitted in a pre-suit email to McMullen: "It does appear that your diamond was either incorrectly graded initially or erroneously switched. Either way, we accept full responsibility."[47]

**f.  Plaintiffs' "Plan of Attack" in Response to Anticipated Consumer Litigation.**

In response to the Mervis lawsuits filed by Hammervold, another diamond retailer who had sold a large volume of EGL diamonds – International Diamond Center ("IDC") – had a memo prepared by Sara Brady, a public relations firm.[48] The memo identified a need for IDC to "Have a Crisis Response Plan in place should another lawsuit be filed against IDC with similar allegations." The memo warned that "if you don't as a group, take some proactive steps, <u>all of you will get sued and end up spending lots of money either through litigation or settlements</u>."[49] The memo recommended taking a "bold" and "proactive" collective "plan of action" to "invalidate Manookian and his cohorts," including demand letters, countersuits, media campaigns, and bar complaints.[50]

On January 22, 2016, the IDC / Sara Brady memo was forwarded to Blank in an email with the subject line "Plan of Attack."[51] The email stated: "Collectively we need to work together on this issue."[52] On January 25, 2016, Diamond Doctor COO Nicole Becker responded to an email forwarding her the "Plan of Attack" email, commenting as follows: "This is exactly what we were

---

[46] Both lab reports are attached as **Exhibit 31**.
[47] Attached as **Exhibit 32**.
[48] Attached hereto as **Exhibit 33**.
[49] Exhibit 33.
[50] Exhibit 33.
[51] Exhibit 33.
[52] Exhibit 33.

talking about Friday. Let's fight!!!!!!!!!!!!!! Get them all together and let's get that united front. We also need to set forth plan B."[53]

On January 25, 2016, Mr. Blank emailed Ronnie Mervis regarding the "plan of attack." Blank relayed: "I am instructing my lawyers to sue the guy in Federal court and have him start spending money. I would very much like for you and others to join me, he is not going away!!!! They believe they can severly [sic] limit the discovery. It would also help your local case."[54] The "local case" to which Blank was referring was the consumer lawsuits Hammervold had filed against Mervis three weeks earlier. Blank expressly communicated his belief that suing Manookian/Hammervold in federal court would help collaterally defend the consumer overgrading cases Hammervold was prosecuting in Maryland state court.

On February 3, 2016, Plaintiffs filed a federal RICO lawsuit against Manookian, alleging that Manookian had extorted them by demanding $3 million dollars to stop a "smear campaign." At the time Plaintiffs made this allegation, they were aware that *they* had affirmatively reached out to Manookian and *they* were the party who first proposed paying Manookian to essentially go away through a sham retainer agreement.

g. **Hammervold's Acceptance of Representation of Claimants Against Diamond Doctor, Plaintiffs' Continued Attempts to Buy-Off Manookian, and Hammervold's Refusal to Enter into Unethical Agreement Restricting his Practice.**

In mid-March 2016, Hammervold sent Texas Deceptive Trade Practices Act ("DTPA") notices on behalf of four (4) consumers who had retained Hammervold to pursue DTPA claims against Blank and The Diamond Doctor. Case No. 4:16-cv-00094, Dkt. 13 at ¶ 25.

On March 21, 2016 – after receiving those notices – Blank and Diamond Doctor amended their complaint. This amended complaint noted: "[s]ince the commencement of this litigation, on

---

[53] Attached as **Exhibit 34**.
[54] Attached as **Exhibit 35** (emphasis added).

March 8, 14, 16, and 18, 2016, Hammervold has sent The Diamond Doctor four demand letters pursuant to the Texas Deceptive Trade Practices Act," and also, "Hammervold is the lead attorney in two pending consumer suits against a Manookian victim in Washington, D.C." Case No. 4:16-cv-00094, Dkt. 13 at ¶ 25.  Based on these facts alone, Plaintiffs began referring to Hammervold a "co-conspirator" to Manookian's so-called "extortion scheme," but did not yet add Hammervold as defendants to the lawsuit. *Id.* at ¶ 96.

On May 19, 2016 – after Plaintiffs had already began referring to Hammervold as a co-conspirator" in their amended complaint – Mr. Blank inquired of a journalist who was preparing an article on Manookian/Blank: "Have they said why Hammervold is involved?"[55] Blank then communicated that he hoped to establish an improper agreement between Manookian and Hammervold to gain an advantage in the anticipated consumer lawsuits: "We would dearly like to establish a fee sharing agreement between them as this would preclude him from working on cases and they would genuinely have to give a legit attorney and receive No money from him in return."[56]

The Plaintiffs' used the federal lawsuit as a way to shape the public narrative, and to attempt to *re-initiate* negotiations to buy-off Manookian, and now Hammervold, from soliciting or prosecuting any consumer claims against the Plaintiffs.

On May 22, 2016, Mr. Blank gave an interview to the Dallas Morning News about his allegations that Manookian had extorted him.[57] Mr. Blank characterized the deal *he actually proposed* to Manookian as "hush money" and claimed he did not go through with it on principle: "I decided I couldn't sleep knowing that someone out there has a 10-year contract of me paying him hush money."[58] Plaintiffs' now-Counsel, Randy Johnston, opined in the article that the deal

---

[55] Attached as **Exhibit 36**.
[56] Exhibit 36.
[57] Attached as Exhibit 37.
[58] Exhibit 37.

discussed between Blank and Manookian was "fraud" and "unethical"  regardless of who proposed

it:

> "You can't go into an agreement that says, 'If you pay me a million dollars, I'll never sue you again,'" said Johnston, who is not involved in this controversy. "So what lawyers try to do is say: 'I can't do that but you can hire me and conflict me out. Just pay me a million dollars for me to sit on my butt and do nothing.' The ABA has said: 'That's a fraud. You're coming in the back door when you can't get through the front door. And you can't do that.'"[59]

On May 27, 2016 – while this case was pending – as an ostensible "settlement," Plaintiffs

offered to pay Manookian $2.4 million over 10 years, in exchange for Manookian's agreement to:

1. Cease all media campaigns and take down all internet activity;
2. Make a public statement in favor of The Diamond Doctor;
3. Agree not to bring or be part of any claims against The Diamond Doctor in the future; and
4. For any potential client who contacts your clients about The Diamond Doctor, your clients would have to say something along lines of, "Diamond Doctor did no wrong when we checked claims against them, but they will exchange your diamond for you"; and
5. To settle all of Hammervold's client's overgrading claims for $200,000.[60] [61]

Incredibly, this settlement offer proposed by Plaintiffs and Plaintiffs' Counsel in this case

was virtually the same terms that Blank and Manookian discussed in November 2015 that Plaintiffs

and their Counsel were actively alleging were "fraud," unlawful, and unethical in this case.

*Compare e.g.,* Dkt. 5 at ¶ 51.

Negotiations of this settlement between Plaintiffs' and Manookian's Counsel apparently

hit a snag when the Plaintiffs had been assuming that Hammervold would be subject to the

agreement, but Manookian's lawyers indicated that they did not represent Hammervold, so

Hammervold would have to be dealt with separately.[62]

---

[59] Exhibit 37.
[60] Hammervold had previously communicated to both sides in this case that his clients would settle their cases for amounts totaling $200,000 because Plaintiffs' counsel.
[61] Attached as Exhibit 38.
[62] Exhibit 38.

On May 31, 2016, Plaintiffs' Counsel emailed Hammervold to determine whether Hammervold and his client's claims were part of Manookian's settlement demands.[63] Hammervold responded that *he* was not part of any settlement demand (only his clients), and his clients' demands were entirely independent of any agreements Plaintiffs might reach with Manookian.[64]

On June 2, 2016, Plaintiffs' Counsel communicated to Hammervold that Plaintiffs were willing to settle all of Hammervold's clients' DTPA claims *only if* Hammervold and his then local Texas counsel, Bill Dipple, agreed to never represent any other claimants against Diamond Doctor (like they had been negotiating to achieve with Manookian in November 2015 and during the pendency of this case):

- "I believe that the only way Mark, my client would be willing to try to reach a resolution with you is to know that there would be no more cases you would present."
- "How can he have assurance that you wouldn't be coming up with additional claimants? That's what I'm trying to accomplish."
- "Let me couch it this way, my client would like to have closure with you and your clients, if and when a settlement is reached. And we want to know, can we have closure so that other claims won't be brought by you?"
- "And so what I recommend you do is speak to Bill about it. And you know, just say, 'Don mentioned to me if we can reach a resolution they'd like to have closure. They don't want to see the Bill and Mark show come running through town again and they want to do that and not just settle the seven cases, but they want closure on it and can that be done?'"
- "I've heard of other lawyers that are representing David Blank and Diamond Doctors say to me, 'Well sure it can be done.' And I've said, 'Tell me how?' Well to this date nobody has told me how." [65]

On June 7, 2016, Hammervold communicated the following to Plaintiffs' Counsel: "Regarding the request you asked that I entertain during our phone conversation on Friday, I cannot agree to it as a condition of settlement based on my research. I don't see an end-run to it either."[66]

---

[63] Attached as **Exhibit 39**.
[64] Attached as **Exhibit 40**.
[65] *See* Dkt. 58-1 at pp. 4-9.
[66] Attached as **Exhibit 41**.

On August 11, 2016, Hammervold, in association with local Texas counsel, filed the first of a series of consumer lawsuits against Diamond Doctor in Texas state court, alleging violation of the DTPA, fraud, and breach of warranty ("consumer claims").[67]

Hammervolds' clients each had factually and legally valid claims against Diamond Doctor for violations of the DTPA. For example, Salman Ali purchased an EGL-I certified diamond that the Diamond Doctor represented was "I" color and "SI1" clarity.[68] On February 10, 2016, the GIA evaluated the diamond, and it was discovered that the diamond was actually five total grades worse: M/SI2.[69]

The DTPA recognizes a cause of action for claimants such as Mr. Ali. "False, misleading or deceptive act" is defined in the DTPA to include "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Tex. Bus. Comm. Code § 17.46(b) (emphasis added); *see also* 16 C.F.R. § 23.1 (recognizing as "unfair or deceptive" the misrepresentation of the "grade, quality, … or any other material aspect of a [diamond]."). Courts across the country – and even diamond industry trade organizations – have recognized that a retailer's misrepresentation of a diamond's color/clarity is a deceptive and unfair trade practice.[70] The Court in *Garcia v. Mervis* and *Ramsey v. Mervis* denied Mervis' motion to dismiss challenging this.[71]

---

[67] Attached as **Exhibit 42**.

[68] **Exhibit 43**.

[69] **Exhibit 44**.

[70] *Skowronski v. Sachs*, 62 Ma.App.Ct. 630, 636 (2005) (affirming jury verdict for fraud and violation of Massachusetts's consumer protection act, based on sale of a "G" color diamond that was represented to be an "F"); *Daughtrey v. Ashe*, 413 S.E.2d. 336 (Va. 1992) (description of diamond as being "v.v.s clarity" in appraisal constitutes an "express warranty," not "opinion" of the diamond); *Carter Hawley Hale Stores v. Conley*, 372 So.2d 965, (Fla. 3d. 1979) (affirming $24,000 verdict against jeweler, for selling a customer an "E" color diamond that had been represented to be a "D"); JVC, *FTC Guidelines for Grading Diamond Quality*, 2014 ("It is unfair and deceptive to misrepresent the grade of a diamond.").

[71] Attached as **Exhibit 45**.

On September 14, 2016, Plaintiffs added Hammervold as defendants to this federal lawsuit. Case No. 4:16-cv-00094, Dkt. 99.

**h.  The Lack of Merit of Plaintiffs' Claims Against Hammervold.**

In their Complaint, the Plaintiffs alleged, without any factual basis that:

1.  "Cummings Manookian, Ramon, Cummings, Manookian, Hammervold, and Hammervold, PLC each have defined roles, but together they function as a unit with a common purpose: extorting millions from their victims." Case No. 4:16-cv-00094, Dkt. 99 at ¶ 72; Dkt. 5 at ¶ 95 (emphasis added).

2.  "Hammervold, [and] Hammervold, PLC … agreed and conspired to smear the business names and ownership of various jewelry retailers across the country including, without limitation, The Diamond Doctor, and extort millions of dollars from them." Case No. 4:16-cv-00094, Dkt. 99 at ¶ 94; Dkt. 5 at ¶ 116 (emphasis added).

The Plaintiffs had absolutely no evidence or information to suggest that Hammervold had "agreed," participated in, or otherwise "conspired" to have the Plaintiffs propose the illicit "extortion agreement" to Manookian in November 2015. The Plaintiffs also had no information to suggest that Hammervold participated in Manookian's predicate media campaign.[72] The Plaintiffs have never communicated with Hammervold (then or now) and Hammervold was not even mentioned by Manookian in November 2015.[73] The Plaintiffs only basis for claiming Hammervold was part of a fraudulent/extortionate criminal conspiracy is that Hammervold accepted of representation of clients referred to him by Manookian.[74] During discovery, the Plaintiffs were unable to identify a single wrongful act by Hammervold outside his capacity as an attorney /

---

[72] See Exhibit 14 at #80.
[73] Plaintiffs' Interrogatory Responses #2 and #3 (Dkt. 66-1); Exhibit 14 at #1-9, 80-82, 98-101; Blank Depo (Dkt. 60) at pp. 231:6-232:22, 233:4-11, 236:1-237:4, 238:16-8.
[74] Plaintiffs' Interrogatory Responses #2 and #3 (Dkt. 66-1).

opposing counsel.[75] Hammervold's actual conduct – deciding to represent clients – is not actionable under RICO or Texas law. *See Snow Ingredients v. SnoWizard,* 833 F.3d. 512, 524-525 (5th Cir. 2016) ("litigation activity cannot be the predicate for a civil-RICO claim."); *Troice v. Proskauer Rose, L.L.P.,* 816 F.3d 341, 348 (5th Cir. 2016) (acts by an attorney in connection with representing a client are "not actionable" by a non-client, particularly an opposing party).

The Plaintiffs and their Counsel were specifically aware that Hammervold was unwilling to be a party to the type of illicit deal at the heart of this case – an exchange of money for a lawyer agreeing not solicit/represent clients against a defendant – because Plaintiffs' Counsel tried to get Hammervold be part of such a deal in May/June 2016, but Hammervold demurred.[76]

### i. The Plaintiffs' Settlement with the Manookian Defendants and Continued Bad Faith Attempts to Get Hammervold to Agree Not to Represent Future Claimants Against Plaintiffs.

Just before the Plaintiffs' case against Manookian was set to go to trial in August 2017, the Plaintiffs entered into a confidential settlement with Manookian. In connection with this settlement, the Plaintiffs and Manookian had this Court enter an Agreed Permanent Injunction enjoining the parties from "disparaging or defaming the services, business, integrity, veracity or personal or professional reputations of the other in either a personal or professional manner at any time and through any medium or intermediary." Case No. 4:16-CV-00094, Dkt. 360.

Although Plaintiffs' Counsel publicly claimed that Plaintiffs "did not have to pay any money" to Manookian or his firm as part of the settlement,[77] Plaintiffs' Counsel has since been forced to admit that the settlement with Manookian actually required Plaintiffs' Counsel to make

---

[75] Blank Depo (Dkt. 60) at p. 236:5-11.
[76] See Exhibits 39-41; Dkt. 58-1, pp. 4-9.
[77] Dkt. 58-1, p. 13 ("Most terms of the settlement were confidential, but Johnston said under the deal, the Blank family did not have to pay any money to Tennessee lawyer Brian Manookian or his law firm Cummins Manookian.")

a payment to Manookian that was structured as Plaintiff's Counsel purchasing internet sites from Manookian:

| | |
|---|---|
| Judge Clement: | What's the status of your case against Mr. Manookian? |
| Howard Klatsky: | Your Honor, there was a compromise, a confidential settlement agreement entered into that resulted in the entry of a, an agreed permanent injunction. So the claims against Mr. Manookian and his firm have been resolved. |
| Judge Clement: | So, does the confidentiality prevent you from saying whether money was paid? |
| Howard Klatsky: | Um, whether money was paid? As part of the settlement? Your Honor, I believe that it does. If you were to order me to answer your question, I would, would certainly, uh, do so. |
| Judge Clement: | Okay. Was the money paid? |
| Howard Klatsky: | As I understand things ... I'm not trying to be cute. The answer is yes and no. Technically no, under the terms of the agreement. However, my recollection of things, and I was one of a handful of lawyers involved, is that one of the law firms who was representing my client agreed to purchase certain internet sites that Mr. Manookian had allegedly posted. |
| Judge Clement: | Like the Facebook ads and all that? |
| Howard Klatsky: | Yes, Your Honor. And that was the way it was ultimately resolved, to the best of my understanding.[78] |

As a condition of receiving this money from Plaintiffs' Counsel, Manookian was apparently *required* to execute an "acknowledgement" that "there was no proof of any fraud by Diamond Doctor."[79] This acknowledgement was contrary to Manookian's consistent position prior to and throughout this litigation before the payoff.

While Hammervold was not privy to the specific terms of the settlement, the circumstantial proof demonstrates that it was the same type of illicit deal that Plaintiffs proposed and attempted

---

[78] See Dkt. 58-1 at ¶ 3 and Exhibit B thereto.
[79] Dkt. 58-1 at ¶ 4 and Exhibit C thereto.

to negotiate with Manookian in November 2015 (the conduct at issue in this case), and then again in May 2016 (as part of an ostensible "settlement" of this case).

On January 31, 2018, Plaintiffs' Counsel presented a written settlement demand to the Hammervold. In connection with the proposed settlement, Plaintiffs and Plaintiffs' Counsel demanded that Hammervold agree not to solicit claims against, or to file suit against the Plaintiffs or to Diamonds Direct (to whom Plaintiffs had sold their business):

> That Mark Hammervold and Hammervold, P.L.C. agree that they will not actively solicit any individual who has not previously retained Hammervold, P.L.C. to pursue affirmative claims for relief against The Diamond Consortium, Inc. and Diamond Consortium, LLC, and/or David Blank to retain Mark Hammervold, Hammervold, P.L.C., or any other attorney or law firm to assert/pursue claims relating to the alleged overgrading and sale of diamonds first shown or sold (whichever date occurred first) to customers on or before November 1, 2016 against, or to file suit against, David Blank, his spouse, his children, his parents, The Diamond Consortium, Inc., Diamond Consortium, LLC, any other privately-held entity that David Blank has a direct or indirect ownership interest in, any employees or former employees of The Diamonds Consortium, Inc., Diamond Consortium, LLC, or Diamonds Direct in the future; …[80]

As in June 2016, Hammervold refused.

## APPLICATION/ARGUMENT

This Court should require the Plaintiffs and Plaintiffs' Counsel to pay Hammervold his reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1927 and this Court's inherent authority under the common law "bad faith" exception to the American Rule, because the Plaintiffs pursued meritless claims against Hammervold in bad faith, as a way to pressure Hammervold into agreeing to never represent future claimants against the Plaintiffs, after Hammervold communicated pre-suit that he could not ethically enter into such an agreement.

In *Blakeman,* the court exercised its inherent authority to require a plaintiff and his attorneys to pay a defendant's attorneys' fees and expenses, where the plaintiff and his attorneys

---

[80] Attached as **Exhibit 46** (emphasis added).

filed a baseless legal malpractice claim against a lawyer defendant in order to coerce that lawyer

defendant to settle other litigation. 2001 Bankr. LEXIS 2244, *33 (Bankr. N.D. Tex. May 31,

2001). The court explained that "illicit purpose plus the total lack of evidentiary basis for the

serious accusations made in the complaint cry out for judicial recognition and appropriate

sanction." *Id.* at *61. "To apply a contrary rule would defeat the ends of justice and the basis behind

the rule allowing the imposition of sanctions for bad faith litigation." *Id.*

The Plaintiffs' lawsuit against Manookian was a sham and a fraud on this Court that

Plaintiffs and Plaintiffs' Counsel used to attempt to achieve the same effective deal *they* proposed,

but could not consummate with Manookian, in November 2015:

| 11/2015<br>"Extortion Contract" | 5/2016<br>"Settlement" Demand | 8/2017<br>"Settlement" |
|---|---|---|
| $3,000,000 over 10 years (Dkt. 5, ¶ 51) | $2,500,000 over 10 years. Exhibit 38. | Undisclosed payment from Plaintiffs' Counsel to Manookian. Dkt. 58-1, p. 11. |
| Cummings Manookian would end media campaign. (Dkt. 5, ¶¶ 48, 52) | "Cease all media campaigns and take down all internet activity." Exhibit 38. | Manookian enjoined from any disparaging of Plaintiffs. Dkt. 360. |
| Manookian would be "conflicted" out of representing any claimants against Plaintiffs in the future. (Dkt. 5, ¶ 52) | "Agree not to bring or be part of any claims against The Diamond Doctor in the future;" Exhibit 38. | Manookian enjoined from any disparaging of Plaintiffs "in either a personal or professional manner at any time and through any medium or intermediary." Dkt. 360. |
| | "Make a public statement in favor of The Diamond Doctor." Exhibit 38. | Manookian required to sign "acknowledgement" that "there was no proof of any fraud by Diamond Doctor." Dkt. 58-1, p. 13. |
| | "For any potential client who contacts your clients about The Diamond Doctor, your clients would have to say something along lines of, "Diamond Doctor did no wrong when we checked claims against them, | Manookian required to sign "acknowledgement" that "there was no proof of any fraud by Diamond Doctor." Dkt. 58-1, p. 13. |

| | but they will exchange your diamond for you"; Exhibit 38. | |
|---|---|---|

The Plaintiffs and their lawyers not only filed and prosecuted meritless claims against Hammervold for an improper collateral purpose – they accused Hammervold of conspiring to force Plaintiffs into an unethical and illegal agreement, while at the same time, repeatedly but unsuccessfully trying to get Hammervold to enter into such an agreement.

The Plaintiffs and Plaintiffs' Counsel knew that Hammervold was not part of the deal that *they* proposed and attempted to consummate with Manookian in November 2015, including because the Plaintiffs had no communications with Hammervold and Hammervold was not even *mentioned* by anyone during that time period.[81] The Plaintiffs did not even know who Hammervold was until he filed lawsuits on behalf of two clients against another jeweler in January 2016.[82] When Plaintiffs and Plaintiffs' Counsel subsequently attempted to seal-off Hammervold by including him in a similar deal they were negotiating with Manookian as a "settlement" to this litigation in May 2016, Hammervold communicated that he could not ethically agree to not solicit or represent claimants against the Plaintiffs in the future.[83]

Hammervold has remained steadfast in refusing Plaintiffs' express demands that he agree not to solicit or represent future claimants against the Plaintiffs, including in January 2018,[84] when Hammervold had essentially exhausted his professional insurance policy limit, could not afford to

---

[81] Plaintiffs' Responses to Hammervold's RFAs, #1-9, 80-82, 98-101; Blank Depo (Dkt. 60) at pp. 231:6-232:22, 233:4-11, 236:1-237:4.
[82] Blank Depo (Dkt. 60) at pp. 233:17-234:1.
[83] Exhibits 38-41, Dkt. 58-1 pp. 4-9.
[84] Exhibit 46.

continue paying his retained counsel, and was fighting for the right to take over his own defense *pro se* at the trial court level.

When it came time for Plaintiffs to prove their claims against Manookian, the Plaintiffs instead entered into an agreement with Manookian that was materially similar to the "extortion agreement" that Plaintiffs' proposed to Manookian in November 2015 and the settlement agreement Plaintiffs proposed to Manookian in May 2016. When it came time for the Plaintiffs to prove their claims against Hammervold – with Hammervold remaining unwilling to settle by unethically restricting his practice – the Plaintiffs just dismissed their claims.

## CONCLUSION

For the foregoing reasons, this Court should require the Plaintiffs and Plaintiffs' Counsel to pay the Defendants' reasonable attorneys' fees and costs. Alternatively, this Court should set an evidentiary hearing to further determine the Plaintiffs basis and reasons for pursuing claims against Hammervold.

Respectfully submitted,

*/s/ Mark Hammervold*
Mark Hammervold
State Bar No. #31147 (TN),
#6320744 (IL), & #103719 (FL)
mark@hammervoldlaw.com
Hammervold PLC
615 Deaderick St., Suite 1550
Nashville, TN 37238
Tel. 615.928.2466
Fax 615.928.2264

*Pro Se Defendant and Attorney*
*for Defendant Hammervold PLC*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on March 14, 2019, Defendants conferred with Plaintiffs regarding the relief sought herein. The Plaintiffs oppose this Motion.

*/s/ Mark Hammervold*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 21, 2019, a true and correct copy of the foregoing filing was served upon all counsel of record via the Court's ECF system.

*/s/ Mark Hammervold*